## A00A0714. ADAMS v. HARE.
(536 SE2d 284)

BARNES, Judge.

Valerie Adams sued Tracey Hare as a result of injuries she received when a horse formerly owned by Hare kicked her. Adams appeals from the trial court's grant of summary judgment to Hare based on her immunity under the Injuries From Equine Activities Act ("Equine Activities Act"), OCGA § 4-12-1 et seq., enacted in 1991. For reasons that follow, we affirm.

On appeal from a grant of summary judgment, this Court conducts a de novo review of the record, construing the evidence and all inferences therefrom in favor of the nonmoving party. *Maddox v. Southern Engineering Co.,* 231 Ga. App. 802, 803 (500 SE2d 591) (1998); *Lane v. Spragg,* 224 Ga. App. 606 (481 SE2d 592) (1997).

Viewed in this light, the record shows that at the time of her injuries, Adams was a professional horse trainer who had trained about 50 horses in the preceding 20 years. She first encountered the horse that caused her injuries, "Bobby," at a horse show in June 1995. She talked to his owner, Hare, and learned that Hare was unhappy with his performance and current trainer. In August 1995, Hare moved Bobby to Adams' barn in the Atlanta area and asked Adams to help her build up his stamina and sell him.

At some point, Adams asked Hare a series of questions about Bobby. On appeal, Adams relies upon Hare's response to these questions to support her suit against Hare.[1] Adams asked about Bobby's history with regard to shoeing, training, and the bit and bridle used on him. She also asked about Hare's experience with the horse at different locations where he had been kept, as well as "what kind of guy is he?" She never asked Hare whether Bobby kicked or inquired

---

[9] Battle does not contend that the trial court committed any error with respect to the first two scenarios.

[1] Adams testified that she did not recall whether this occurred at the horse show in Tennessee or "after he had come to us or in the process of."

about his "mental condition." According to Adams, Hare told her "what she knew about the bit [used] and showing and her experience with taking care of him . . . and her initial show ring experience with him. . . ." Hare also told her that Bobby had "no problems."

In December 1995, Adams acted as a sales agent when Hare sold Bobby to one of Adams' clients, Valerie Maneely.

In April 1996, Bobby injured Adams while she was preparing him for the first day of competition at a horse show in Clemson, South Carolina. Adams entered Bobby's stall to cross-tie, brush, and blanket him before turning him loose and allowing him a little freedom before the start of the show. After fastening one cross-tie and while she was moving to Bobby's left front side to fasten the other, Bobby "spun and kicked [her] in the right thigh" before she even knew that he had turned around. The kick knocked her against the wall of Bobby's stall, where she was pinned by Bobby's rear end. Adams testified that while Bobby pinned her against the wall, he turned around to look at her and repeatedly kicked the stall wall. According to Adams, "the horse knew full well that I was right there," and was intentionally trying to harm her. Bobby eventually kicked Adams in the knee, causing her to fall to the ground. As Adams crawled out of the stall to safety, Bobby "continued to kick and spin and thrash."

Adams testified that before her injury, she never saw Bobby kick or attempt to kick a person. She experienced no problems with Bobby's behavior in the eight months that she cared for him before her injury. She further testified that Bobby never repeated his inappropriate behavior after the incident through March 1998, when Maneely sold Bobby.

Adams asserts Hare intentionally and maliciously misrepresented that Bobby had no problems based on information provided by Hare's friend, Amy Gessler. After Adams' injury, Gessler called Hare and told her she was not surprised when she learned Adams had been hurt because she had witnessed Bobby act in ways that could be dangerous to himself or people on more than one occasion. Adams contends these specific behaviors included: rearing, striking out with his front foot, and running into people on purpose.

In her deposition, Gessler testified that she saw the horse regularly for a three-month period at some point before Hare sold him to Maneely. In her opinion, Bobby was an inconsistent horse that she did not trust in the stall because sometimes

> he would just forget that you were there, and he'd run over you. A normal horse will swat at a fly with his tail or stomp his foot. That horse would cowkick at a fly, he hated them so bad. And if you happened to be in the way, you'd get it. He

pawed to the point where I had to cut a mat, a rubber mat that you lay down in the dirt, and you'd put shavings on top of it to try to protect the stall bottom so you don't have to replace the dirt all of the time. I had to cut a mat so that it would come out in front of his stall where he could stand there and continuously paw at this mat. And he would do that for a few days and then he'd quit. And he wouldn't do it for a while and then he'd start it again.

Gessler explained that Hare was aware of this behavior because she reported it to Hare when she returned from her trips.[2] She also believed that Hare may have been present with her when the horse behaved in this manner. According to Gessler, Bobby was not a malicious horse that intentionally tried to harm her. Instead, "[h]e was like a child and completely unaware at times of my presence or where I was in conjunction with himself."

The trial court granted summary judgment to Hare because it concluded she was immune from liability under the Equine Activities Act. On appeal, Adams asserts the Act does not apply to the facts of this case, and that even if it did, three exceptions to immunity embodied in the Act apply. See OCGA § 4-12-3 (b) (1) (B), (3), (4).

1. We find no merit in Adams' claim that the Equine Activities Act does not apply because this case involves misrepresentations in the sale of a horse, not equine activities.

The Act provides that "an equine activity sponsor, an equine professional . . . *or any other person* . . . shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activities." (Emphasis supplied.) OCGA § 4-12-3 (a). The General Assembly expressly provided us with their legislative findings and the intent behind this Act.

> The General Assembly recognizes that persons who participate in equine activities . . . may incur injuries as a result of the risks involved in such activities. The General Assembly also finds that the state and its citizens derive numerous economic and personal benefits from such activities. The General Assembly finds, determines, and declares that this chapter is necessary for the immediate preservation of the public peace, health, and safety. It is, therefore, the intent of the General Assembly to encourage equine activities . . . by limiting the civil liability of those involved in such activities.

---

[2] Hare worked as a flight attendant, and Gessler would care for the horse while Hare was out of town.

OCGA § 4-12-1.

It then broadly defined "equine activities" to include:

(A) Equine shows, fairs, competitions, performances or parades that involve any or all breeds of equines and any of the equine disciplines . . . ; (B) Equine training or teaching activities, or both; (C) Boarding equines; (D) Riding, inspecting, or evaluating an equine belonging to another . . . ; (E) Rides, trips, hunts, or other equine activities . . . sponsored by an equine activity sponsor; (F) Placing or replacing horseshoes on an equine; and (G) Examining or administering medical treatment to an equine by a veterinarian.

OCGA § 4-12-2 (4).

The legislature defined "inherent risks of equine activities" as "those dangers or conditions which are an integral part of equine activities . . . , *including, but not limited to*: (A) The propensity of the animal to behave in ways that may result in injury, harm, or death to persons on or around them. . . ." (Emphasis supplied.) OCGA § 4-12-2 (7) (A).

A "participant" for purposes of the Act "means any person, whether amateur or professional, who engages in equine activity. . . ." OCGA § 4-12-2 (12)

Finally, the legislature defined "engages in an equine activity" as "riding, training, assisting in providing medical treatment of, driving, or being a passenger upon an equine, whether mounted or unmounted, *or any person assisting a participant* or show management." (Emphasis supplied.) OCGA § 4-12-2 (2).

The facts of this case fall squarely within the terms of the Equine Activities Act. Hare cannot be held liable for the injury to Adams, a participant,[3] that resulted from the inherent risks of equine activities.[4] See OCGA § 4-12-3 (a).

2. We also reject Adams' argument that this case falls within the following three exceptions to immunity under the Act, under which a person's liability is not limited if she:

Provided the animal and failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity . . . and to safely manage the particular animal based on the participant's repre-

---

[3] Adams falls within the definition of "participant" because she was preparing Bobby to be ridden by Maneely in a horse show.

[4] Adams' injury resulted from her proximity to Bobby while preparing him for a horse show and Bobby behaving in a way "that may result in injury . . . to persons . . . around [him]." OCGA § 4-12-2 (7) (A).

sentations of his or her ability; . . . Commits an act or omission that constitutes willful or wanton disregard for the safety of the participant, and that act or omission caused the injury; or Intentionally injures the participant.

OCGA § 4-12-3 (b) (1) (B), (3), (4).

(a) Adams asserts the exception in subsection (b) (1) (B) applies because Hare sold Bobby to Maneely without determining "whether her buyer (a novice rider) had the skill to safely manage the horse. . . ." We find no merit in this argument because Adams was the "participant" injured by Bobby, not Maneely.

(b) Adams asserts that Hare's failure to disclose Bobby's "dangerous behavioral patterns" constituted wilful and wanton disregard for Adams' safety within the meaning of OCGA § 4-12-3 (b) (3). We disagree.

In *Muller v. English*, 221 Ga. App. 672, 676 (2) (c) (472 SE2d 448) (1996), we construed the Equine Activities Act for the first time and outlined the following definitions of "wilful" and "wanton":

Wilful [misconduct] is based on an actual intention to do harm or inflict injury; wanton conduct is that which is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent. Wilful misconduct, or wilful failure or refusal to perform a duty required by statute, is more than negligence or even gross negligence; it involves conduct of a criminal or quasi-criminal nature, the intentional doing of something, either with the knowledge that it is likely to result in serious injury, or with the wanton and reckless disregard of its probable consequences.

(Citations and punctuation omitted.) In this case, the evidence, viewed in the light most favorable to Adams, falls short of demonstrating a wilful and wanton disregard for the safety of Adams by Hare. First, there is no evidence that Bobby *intentionally* kicked a human being before injuring Adams. Second, even if we consider Adams' testimony that Gessler told her that Bobby would run into people "on purpose," a fact that was not corroborated by Gessler in her deposition,[5] no evidence shows that Hare knew Bobby would

---

[5] A nonmoving party can "withstand a motion for summary judgment by submitting sworn testimony averring personal knowledge of the existence of a prior inconsistent statement made by a witness upon whose sworn testimony the movant relies." (Citations and punctuation omitted.) *State Farm &c. Ins. Co. v. Swetmon*, 228 Ga. App. 538, 539-540 (492 SE2d 678) (1997).

intentionally try to kick people, as he did when he injured Adams.[6]

(c) For the reasons stated in Division 2 (b), the immunity exception for the intentional injury of a participant does not apply. See OCGA § 4-12-3 (b) (4).

3. Because the evidence shows that this case falls within the scope of the Equine Activities Act and no exceptions to immunity under that Act apply, the trial court did not err by granting summary judgment to Hare.

*Judgment affirmed. Blackburn, P. J., and Eldridge, J., concur.*

DECIDED JUNE 23, 2000 

*Johnny N. Panos, Robert C. Koski,* for appellant.
*Hawkins & Parnell, William H. Major III, Alycen G. Adams,* for appellee.

---

[6] Gessler testified that Hare was aware that Bobby might unintentionally kick a person in the vicinity of a fly or accidentally run into a person.