**FOURTH DIVISION**
**DOYLE, P. J.,**
**MILLER and DILLARD, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 10, 2014**

# In the Court of Appeals of Georgia

A14A0815. HOLCOMB v. LONG.

DILLARD, Judge.

Michael Holcomb filed a civil action against Charles Long d/b/a Charles Long Farms ("Long"), alleging that Long's negligence in saddling one of the horses that he owned and a faulty saddle resulted in Holcomb falling from the horse and suffering serious injuries. Long moved for summary judgment, which the trial court granted. Holcomb now appeals, arguing that the trial court erred in ruling that Long was entitled to civil immunity under Georgia's Injuries From Equine Or Llama Activities Act[1] ("Equine Activities Act") because none of the exceptions to immunity outlined in the statute applied. For the reasons set forth *infra*, we affirm.

---

[1] *See* OCGA § 4-12-1 *et seq.*

Viewed in the light most favorable to the nonmovant,[2] the record shows that Holcomb and Long were acquaintances through their membership in a local civic organization, and Holcomb had previously mentioned that he and his granddaughter were interested in riding the horses at Long's farm. Long extended an invitation to Holcomb and his granddaughter and, consequently, on April 7, 2011, they went to Long's farm to ride horses. Upon their arrival, Long inquired as to their riding experience, and Holcomb stated that he had ridden horses often as a young man (while his granddaughter had very little riding experience). Subsequently, Long first saddled a horse named "Elvis" for Holcomb's granddaughter and then saddled a very docile horse named "Tumbleweed" for Holcomb to ride. Next, he directed Holcomb and his granddaughter to first ride within the fenced corral so that he could assess their respective levels of competency.

After about ten or fifteen minutes, Long saw that Holcomb and his granddaughter could handle the horses rather well and, therefore, told them that they could ride out to the pasture and nearby trails, which they did. Holcomb and his

---

[2] *See Martin v. Herrington Mill, LP*, 316 Ga. App. 696, 697 (730 SE2d 164) (2012) ("[A] de novo standard of review applies to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant." (punctuation omitted)).

granddaughter then rode for approximately one hour, during which time Holcomb did not notice anything wrong with Tumbleweed's saddle. But as they headed toward the trails, Holcomb turned backwards to his left in the saddle to see if his granddaughter was immediately behind him. And as he did so, the horse flexed its body to its left, and the saddle began to slide to the right. The horse then began to gallop, but with the saddle continuing its slide to the right, Holcomb fell, struck his head on a fence post, and suffered serious injuries.

Thereafter, Holcomb filed suit against Long to recover damages for the injuries he suffered, alleging, *inter alia*, that the accident was the result of Long's failure to re-tighten the front girth, or cinch,[3] of the saddle, as well as his failure to utilize a cinch hobble[4] to secure the saddle. Long answered, and discovery ensued.

In deposition testimony, Holcomb's expert opined that the accident was a result of Long's failure to adequately tighten Tumbleweed's saddle. Specifically,

---

[3] The front cinch is the wide strap that fits under the horse and attaches to the rigging to secure the saddle. On English style saddles, this part is more commonly known as a girth. *See* Western Saddle Guide, http://www.western-saddle-guide.com/cinch.html (last visited October 15, 2014).

[4] The cinch hobble connects the front and flank cinches together. *See* Western Saddle Guide, http://www.western-saddle-guide.com/cinch-connecting-strap.html (last visited October 15, 2014).

Holcomb's expert testified that the front girth of the saddle should have been re-tightened after five or ten minutes of riding because it tends to loosen for various reasons as the saddle settles on the horse. However, he did not believe it was likely that the lack of a cinch hobble contributed to the accident. In his own deposition, Long agreed that a saddle will loosen as a horse walks or sweats and conceded that he did not re-check Tumbleweed's saddle at any point after Holcomb began riding.

Once discovery concluded, Long filed a motion for summary judgment, arguing that the Equine Activities Act cloaked him with civil immunity and, therefore, barred Holcomb's lawsuit.[5] Holcomb responded, arguing that two of the statute's exceptions to its general grant of immunity applied, and thus, summary judgment was not warranted. Nevertheless, after holding a hearing on the matter, the trial court granted summary judgment in favor of Long. This appeal follows.

At the outset, we note that it is well established that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[6]

---

[5] *See* OCGA § 4-12-1 *et seq.*

[6] OCGA § 9-11-56 (c).

4

If summary judgment is granted by a trial court, it enjoys no presumption of correctness on appeal, "and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met."[7] And in our *de novo* review of a trial court's grant of a motion for summary judgment, we are charged with "viewing the evidence, and all reasonable conclusions and inferences drawn from the evidence in the light most favorable to the nonmovant."[8] With these guiding principles in mind, we turn now to Holcomb's specific claims of error.

1. Holcomb contends that the trial court erred in finding that the Equine Activities Act barred his lawsuit, arguing that Long was not entitled to immunity because he provided faulty tack or equipment. We disagree.

In interpreting any statute, we necessarily begin our analysis with familiar and binding canons of construction. Indeed, in considering the meaning of a statute, our charge as an appellate court is to "presume that the General Assembly meant what it said and said what it meant."[9] And toward that end, we must afford the statutory text

---

[7] *Cowart v. Widener*, 287 Ga. 622, 624 (1) (a) (697 SE2d 779) (2010).

[8] *Benefield v. Tominich*, 308 Ga. App. 605, 607 (1) (708 SE2d 563) (2011) (punctuation omitted).

[9] *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (punctuation and citation omitted); *see Arby's Restaurant Group, Inc. v. McRae*, 292

its plain and ordinary meaning,[10] consider the text contextually,[11] read the text "in its most natural and reasonable way, as an ordinary speaker of the English language would,"[12] and seek to "avoid a construction that makes some language mere

---

Ga. 243, 245 (1) (734 SE2d 55) (2012) (same); *Martinez v. State*, 325 Ga. App. 267, 273 (750 SE2d 504) (2013) (same).

[10] *See Deal*, 294 Ga. at 172 (1) (a) ("To that end, we must afford the statutory text its plain and ordinary meaning.") (punctuation and citation omitted); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies) . . . ."); *Singletary v. State*, 310 Ga. App. 570, 572 (713 SE2d 698) (2011) ("In construing these statutes, we apply the fundamental rules of statutory construction that require us to construe the statutes according to their terms, [and] to give words their plain and ordinary meaning . . . .") (punctuation and citation omitted).

[11] *See Arizona v. Inter Tribal Council of Arizona, Inc.*, ___ U.S. ___ (133 SCt 2247, 2254, 186 L.Ed.2d 239) (2013) (Scalia, J.) ("Words that can have more than one meaning are given content, however, by their surroundings.") (punctuation and citation omitted); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]"); *Hendry v. Hendry*, 292 Ga. 1, 3 (1) (734 SE2d 46) (2012) (same); *In the Interest of L. T.*, 325 Ga. App. 590, 592 (754 SE2d 380) (2014) (same); *Martinez*, 325 Ga. App. at 273 (2013) (same); *see also Scherr v. Marriott Intern., Inc.*, 703 F3d 1069, 1077 (7th Cir. 2013) (Manion, J.) ("In statutory construction cases, we begin with the language of the statute itself and the specific context in which that language is used.") (punctuation and citation omitted); OCGA § 1–3–1(b) ("In all interpretations of statutes, the ordinary signification shall be applied to all words . . . .").

[12] *Deal*, 294 Ga. at 172–73 (1) (a); *see Luangkhot v. State*, 292 Ga. 423, 424 (1) (736 SE2d 397) (2013) (same); *Martinez*, 325 Ga. App. at 273 (2013) (same).

surplusage."[13] In sum, where the language of a statute is plain and susceptible of only one natural and reasonable construction, "courts must construe the statute accordingly."[14]

With regard to the Equine Activities Act, the General Assembly left little doubt as to how it expected this statute to be construed. Indeed, the Act's preamble (OCGA § 4-12-1) explicitly provides:[15]

---

[13] *In the Interest of L. T.*, 325 Ga. App. at 592 (punctuation and citation omitted); *see also Ga. Transmission Corp. v. Worley*, 312 Ga. App. 855, 856 (720 SE2d 305) (2011) (same); *Singletary*, 310 Ga. App. at 572 (same).

[14] *Luangkhot*, 292 Ga. at 424 (1) (punctuation omitted); *see Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end.") (punctuation omitted); *Martinez*, 325 Ga. App. at 273 (2013) (same).

[15] As a part of an act passed by the General Assembly and approved by the governor, the preamble of a statute may properly be considered by our courts to the extent that it sheds light on the meaning of the substantive terms contained in the statute. *See JIG Real Estate, LLC v. Countrywide Home Loans, Inc.*, 289 Ga. 488, 492-493 (712 SE2d 820) (2011); *Concerned Citizens of Willacoochee v. City of Willacoochee*, 285 Ga. 625, 626 (680 SE2d 846) (2009); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 218 (1st ed. 2012) (noting that "[s]ome courts and commentators have said that the prologue [*i.e.*, preamble to a statute] cannot be invoked when the text is clear. This limitation is reasonable if it means that the prologue cannot give words and phrases of the dispositive text itself a meaning that they cannot bear. But the limitation is unreasonable and erroneous if it means that the prologue cannot be considered in determining which of various permissible meanings the dispositive text bears. If the prologue is indeed an appropriate guide to meaning, it ought to be considered along

The General Assembly recognizes that persons who participate in equine activities . . . may incur injuries as a result of the risks involved in such activities. The General Assembly also finds that the state and its citizens derive numerous economic and personal benefits from such activities. The General Assembly finds, determines, and declares that this chapter is necessary for the immediate preservation of the public peace, health, and safety. It is, therefore, the intent of the General Assembly to encourage equine activities . . . by limiting the civil liability of those involved in such activities.

The General Assembly then established the limits of such civil liability in OCGA § 4-12-3 (a), which, in relevant part, provides:

Except as provided in subsection (b) of this Code section, an equine activity sponsor, an equine professional, . . . or any other person . . . shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activities . . . and, except as provided in subsection (b) of this Code section, no participant or participant's representative shall make any claim against, maintain an action against, or recover from an equine activity sponsor, an equine professional, . . . or any other person for injury, loss, damage, or death of the participant resulting from any of the inherent risks of equine activities . . . .

---

with all other factors in determining *whether* the instrument is clear. The factors undermining its reliability affect its weight, not its relevance").

In the case *sub judice*, there is no dispute that the parties were engaged in "equine activities" as defined by the statute[16] or that Holcomb was a "participant" in such activities.[17] Nevertheless, while acknowledging the general applicability of OCGA § 4-12-3 (a), Holcomb argues that summary judgment was not warranted because Long provided faulty equipment or tack and, therefore, under OCGA § 4-12-3 (b) (1) (A), was not entitled to civil immunity.

The relevant part of OCGA § 4-12-3 (b) (1) (A) provides:

> Nothing in subsection (a) of this Code section shall prevent or limit the liability of an equine activity sponsor, an equine professional, . . . or any other person if the equine activity sponsor, equine professional, . . . or person . . . [p]rovided the equipment or tack, and knew or should have known that the equipment or tack was faulty, and such equipment or tack was faulty to the extent that it did cause the injury.[18]

---

[16] *See* OCGA § 4-12-2 (2) ("'Engages in an equine activity' means riding, training, assisting in providing medical treatment of, driving, or being a passenger upon an equine, whether mounted or unmounted, or any person assisting a participant or show management.").

[17] *See* OCGA § 4-12-2 (12) ("'Participant' means any person, whether amateur or professional, who engages in an equine activity or who engages in a llama activity, whether or not a fee is paid to participate in such activity.").

[18] OCGA § 4-12-3 (b) (1) (A).

9

And here, Holcomb specifically contends that Long's failure to re-tighten the front girth during the ride and Long's provision of a saddle that did not include a cinch hobble to connect the front and rear girths constituted providing "faulty tack" within the meaning of the statute, causing the saddle to slide off the horse he was riding. However, we do not agree that the term "faulty tack" can fairly be construed so broadly.

To begin with, Holcomb's own expert acknowledged that cinch hobbles are not always used and stated that he did not think it likely that the lack of a cinch hobble caused the accident in this instance. Thus, we find no support for Holcomb's argument that the lack of a cinch hobble in this case amounted to "faulty tack" under the statute.[19]

Furthermore, while the expert testified that Holcomb's fall was a result of Long's failure to re-tighten the front girth, he also stated that he observed nothing defective about the girth or saddle itself. Consequently, even assuming that Long's failure to re-tighten the front girth caused the accident, we are not persuaded that such

---

[19] *See Mays v. Valley View Ranch, Inc.*, 317 Ga. App. 143, 150-51 (2) (b) (ii) (730 SE2d 592) (2012) (holding that defendant's failure to provide quick release tie ropes when plaintiff was tacking up her horse did not constitute faulty equipment for purposes of the faulty equipment exception to the Injuries From Equine Or Llama Activities Act's civil-immunity provision).

inaction constitutes "faulty tack" within the meaning of the statute. Although we have found no Georgia case law defining "faulty tack," we decline to construe that exception as encompassing tack that is inadequately secured but otherwise in good working order.[20] Indeed, doing so would run afoul of the General Assembly's expressed desire of creating broad immunity for equine professionals engaging in equine activities with narrowly defined exceptions.[21]

---

[20] *See Hubner v. Spring Valley Equestrian Ctr*, 1 A3d 618, 631 (III) (C) (N.J. 2010) (holding that faulty equipment exception in New Jersey Equine Activities Liability Act did not encompass cavaletti (rails placed on the ground for training purposes), which were in good working order but allegedly faulty because they were not secured, given the fact that in passing the act, the legislature provided that the provisions expressing the scope of the risks assumed would be read broadly in favor of the facility operators, while the obligations of the operators would be narrowly construed); *cf. Zuckerman v. Coastal Camps, Inc.*, 716 FSupp2d 23, 29-33 (II) (B) (1) - (2) (D. Me. 2010) (holding that genuine issues of material fact existed as to whether tack provided by equine activity sponsor constituted faulty tack, so as to fall under exception to protection provided by Maine Equine Activities Act in action in which plaintiff alleged that defendant negligently saddled her horse and further noting the lack of any suggestion that act was meant to repudiate possibility of simple negligence arising in the context of equine activities).

[21] *See U.S. Bank Nat'l Ass'n v. Gordon*, 289 Ga. 12, 15 (709 SE2d 258) (2011) ("[S]tatutes 'in pari materia,' i.e., statutes relating to the same subject matter, must be construed together." (citation and punctuation omitted)); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]"); *Hendry*, 292 Ga. at 3 (1) (same); *In the Interest of L. T.*, 325 Ga. App. at 592 (same); *Martinez*, 325 Ga. App. at 273 (same).

2. Holcomb also contends that the trial court erred in finding that the Equine Activities Act barred his lawsuit, arguing that Long was not entitled to immunity because he wantonly disregarded Holcomb's safety. Again, we disagree.

This additional exception to civil immunity, which Holcomb claims applies here, is found in OCGA § 4-12-3 (b) (3) and provides:

> Nothing in subsection (a) of this Code section shall prevent or limit the liability of an equine activity sponsor, an equine professional, . . . or any other person if the equine activity sponsor, equine professional, . . . or person . . . [c]ommits an act or omission that constitutes willful or wanton disregard for the safety of the participant, and that act or omission caused the injury. . . .

In *Muller v. English*,[22] this Court construed the Equine Activities Act for the first time. And with regard to the statute's use of the terms "willful" and "wanton," we held that

> [w]ilful [misconduct] is based on an actual intention to do harm or inflict injury; wanton conduct is that which is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent. Wilful misconduct, or wilful failure or refusal to perform a duty required by statute, is more than negligence or even gross negligence; it involves conduct of a criminal or quasi-criminal nature,

___

[22] 221 Ga. App. 672 (472 SE2d 448) (1996).

12

the intentional doing of something, either with the knowledge that it is likely to result in serious injury, or with the wanton and reckless disregard of its probable consequences.[23]

Here, as previously noted, the evidence shows that Holcomb fell from Tumbleweed as a result of the saddle's front girth loosening, rendering the saddle unstable. Additionally, Holcomb's expert testified that Long should have re-tightened the saddle during Holcomb's ride. And although Holcomb testified that Long admitted to him that he noticed the saddle beginning to loosen while Holcomb rode in the pasture, such evidence—at most—would establish Long's negligence or perhaps gross negligence. But negligence does "not show criminal or quasi-criminal conduct, recklessness, or indifference to the consequences so as to amount to evidence of willful or wanton disregard for the safety of the participant."[24] Accordingly, the trial court did not err in ruling that Long was entitled to civil immunity under OCGA § 4-12-3 (a).[25]

---

[23] *Id.* at 676 (2) (c) (citations and punctuation omitted); *accord Adams v. Hare*, 244 Ga. App. 605, 609 (2) (b) (536 SE2d 284) (2000).

[24] *Muller*, 221 Ga. App. at 678 (2) (c) (punctuation omitted); *accord Adams*, 244 Ga. App. at 609 (2) (b).

[25] *See Adams*, 244 Ga. App. at 609 (2) (b) (holding that former owner's alleged failure to disclose horse's dangerous behavior did not constitute willful and wanton

3. Holcomb further contends that the trial court erred in ruling that no genuine issue of material fact existed as to whether the lack of a cinch hobble proximately caused the accident. However, in light of our holding in Division 1, *supra*, this contention is a nonstarter.

As previously noted, OCGA § 4-12-3 (b) (1) (A) provides that nothing in OCGA § 4-12-3 (a) prevents or limits liability if the equine activity sponsor, equine professional, or person "[p]rovided the equipment or tack, and knew or should have known that the equipment or tack was faulty, and such equipment or tack was faulty *to the extent that it did cause the injury*."[26] While the last part of this subsection requires a showing of proximate cause, such a showing is predicated on first establishing that the tack in question was faulty. Given our holding that Holcomb failed to show that the lack of a cinch hobble constituted "faulty tack" within the meaning of the statute, we need not address this issue.[27]

---

disregard for plaintiff's safety within the meaning of OCGA § 4-12-3 (b) (3)); *Muller*, 221 Ga. App. at 677-78 (2) (c) (holding that defendant's conduct in riding a horse with a known propensity to kick did not constitute willful or wanton disregard for plaintiff's safety).

[26] OCGA § 4-12-3 (b) (1) (A) (emphasis supplied).

[27] In reviewing the summary judgment order, we recognize that the trial court focused on whether Holcomb established that the lack of a cinch hobble proximately

14

*Judgment affirmed. Doyle, P. J., and Miller, J., concur.*



caused the accident rather than whether the lack of a cinch hobble constituted faulty tack or equipment. Nevertheless, "[s]ummary judgment may be affirmed if it is right for any reason." *Jones v. Bd. of Regents of the Univ. Sys. of Ga.*, 262 Ga. App. 75, 77 (1) (585 SE2d 138) (2003).