**THIRD DIVISION**
**DILLARD, P. J.,**
**GOBEIL and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.gov/rules

**June 11, 2026**

# In the Court of Appeals of Georgia

A26A0668. NEAL et al. v. METRO CONTENTS, INC.

DILLARD, Presiding Judge.

Donald and Betty Neal experienced a house fire. They hired Metro Contents, Inc., to perform cleaning and restoration services for some of their damaged personal property. The parties later had a dispute over whether the Neals adequately compensated Metro Contents for its services. The Neals eventually sued the company for conversion, fraud, and punitive damages. Metro Contents then counterclaimed for breach of contract, quantum meruit, and bad faith and stubborn litigiousness. The trial court granted partial summary judgment to Metro Contents, and the Neals appeal. More precisely, the Neals argue the trial court erred in finding that (1) they were liable under *quantum meruit* to pay the full amount Metro Contents billed for its services,

and (2) Metro Contents was not required to be licensed under the Georgia Motor Carrier Act ("GMCA").[1] For the following reasons, we affirm.

Viewing the evidence in the light most favorable to the Neals (*i.e.*, the nonmoving parties),[2] the record shows that on August 20, 2020, their home was "seriously damaged" by a fire. The Neals hired Metro Contents to "recover [their] household goods that were salvageable." Metro Contents generated a work-authorization form for its services, but a company representative testified the Neals did not sign it, and it did not include a description of services or an agreed-upon price.[3] According to Betty, Metro Contents's employees came to the Neals' home, packed their household belongings, and moved them to a storage facility. Betty testified that Metro Contents completed this work by September 28, 2020.

---

[1] See OCGA § 40-1-50, et seq.

[2] See, e.g., *Martin v. Herrington Mill, LP*, 316 Ga. App. 696, 696 (730 SE2d 164) (2012).

[3] Despite the voluminous record, neither party cites a legible version of the work-authorization form. Even so, there was witness testimony about its contents, and the parties do not appear to disagree about the form's substance.

Metro Contents sent an itemized bill of $92,288.38 to the Neals' insurance adjuster.[4] Ultimately, the adjuster paid the Neals $50,000 under their policy for personal property and advised that they needed to negotiate a settlement with Metro Contents as to any additional recovery.[5] At this point, the Neals retained counsel, who sent a letter to Metro Contents demanding the return of their personal property. Their counsel added that the Neals were "fully cognizant" Metro Contents was entitled to "compensation for the reasonable value of the services performed[,]" but they disagreed $92,288.38 was reasonable. And while Metro Contents allowed the Neals to inspect their property at its storage facility, one of its representatives informed the Neals it would not return their property until the full $92,288.38 was paid. The Metro Contents representative also threatened the Neals with legal action if they did not pay that amount.

---

[4] The Neals summarily contend that Metro Contents charged them over $54,000 for "cleaning not done," but the page of the invoice they reference does not support this assertion.

[5] The Neals' insurance company paid them a total of $453,000 for reconstruction of their home and $181,200 in personal-property coverage. After that, the Neals had $50,000 remaining under their personal-property limits. And per the Neals' request, none of those funds were paid to Metro Contents.

Eventually, after Metro Contents and the Neals could not reach a settlement as to the amount owed, the Neals sued Metro Contents for conversion of their personal property, fraud, equitable relief "to prevent [Metro Contents] from destroying their personal property," as well as punitive damages. Metro Contents filed an answer, raising several affirmative defenses and asserting counterclaims for breach of contract, quantum meruit, and bad faith and stubborn litigiousness. Metro Contents also requested that it be allowed to dispose of the Neals' personal property to make room in its storage facility for paying customers.

Discovery ensued, and eventually, the Neals moved for summary judgment. In doing so, they sought "two results"—dismissal of Metro Contents's "counterclaim for illegality"[6] and the grant of their request for the return of personal property. Following Metro Contents's response, the trial court denied the Neals' motion. Relevant here, Metro Contents filed two motions for partial summary judgment—one seeking summary judgment on "the issue of liability of the Neals to Metro Contents, Inc., or its counterclaim" and one seeking a judgment that, as a matter of law, it is not

---

[6] Considering the record as a whole, it appears the Neals do not mean that Metro Contents asserted "a counterclaim for illegality." Indeed, the Neals claim they "raised the *defense* of illegality" based on Metro Contents's failure to obtain a required license under the GMCA. (Emphasis added).

subject to the GMCA. The Neals filed responses to the motions, but after a hearing, the trial court granted partial summary judgment to Metro Contents. This appeal by the Neals follows.

Summary judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."[7] And a *de novo* standard of review "applies to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant."[8] Moreover, at the summary-judgment stage, "[w]e do not resolve disputed facts, reconcile the issues, weigh the evidence, or determine its credibility, as those matters must be submitted to a jury for resolution."[9] With these guiding principles in mind, we turn to the Neals' specific claims of error.

---

[7] OCGA § 9-11-56(c). Accord *Cowart v. Widener*, 287 Ga. 622, 623(1)(a) (697 SE2d 779) (2010).

[8] *Martin*, 316 Ga. App. at 697 (quotation marks omitted).

[9] *Tookes v. Murray*, 297 Ga. App. 765, 766 (678 SE2d 209) (2009).

1. The Neals first argue the trial court erred in finding them liable "in some amount" to Metro Contents and that genuine issues of material fact remain as to whether they are liable under a theory of quantum meruit. We disagree.

In support of their argument, the Neals provide only two legal citations—one for the requirements necessary to obtain relief under quantum meruit and one for the proposition that, at the summary-judgment stage, we do not weigh the evidence or make credibility determinations.[10] Other than that, the Neals merely make conclusory allegations unsupported by a single record citation.[11] As we have explained, a claim of error is abandoned when an appellant cites only basic legal authority (such as the standard of review), but provides no legal authority applicable to his or her specific

---

[10] See *Woods v. Hall*, 315 Ga. App. 93, 96 (726 SE2d 596) (2012) ("[A]n assertion of error followed by a case citation is not legal argument, which requires, at a minimum, a discussion of the appropriate law as applied to the relevant facts." (punctuation omitted)).

[11] See *Austell Healthcare v. Scott*, 308 Ga. App. 393, 395(1) (707 SE2d 599) (2011) (holding that when the alleged error "is shown only in the appellant's brief and not by the record, we must assume that the trial court's rulings were correct" (quotation marks omitted)); *Fleming v. Advanced Stores Co.*, 301 Ga. App. 734, 735 (688 SE2d 414) (2009) ("It is not the function of this [C]ourt to cull the record on behalf of a party in search of instances of error." (punctuation omitted)).

arguments on appeal.[12] Suffice it say, rhetoric is not a "substitute for cogent legal

analysis, which is, at a minimum, a discussion of the appropriate law *as applied to the*

*relevant facts*."[13]

Put simply, the Neals abandoned this claim of error by failing to make a cogent

argument applying relevant legal authority to these facts. So, we take this opportunity

to remind counsel that "the requirements as to the form of appellate briefs were

created, not to provide an obstacle, but to aid parties in presenting their arguments in

a manner most likely to be fully and efficiently comprehended by this Court."[14]

---

[12] See *Seals v. State*, 350 Ga. App. 787, 789(1) (830 SE2d 315) (2019) (holding that a claim of error was abandoned when the only legal authority cited by the appellant was the standard for considering this issue); *Gunn v. State*, 342 Ga. App. 615, 623–24(3) (804 SE2d 118) (2017) (holding that appellant abandoned two claims of error when, beyond one or two case citations to "the most basic legal authority" as to the purpose of the legal rule at issue and the general standard applicable to claims at issue, appellant provided no legal authority to support his *specific* contentions as to how and why the trial court committed error, and noting that "mere conclusory statements are not the type of meaningful argument contemplated by our rules" (punctuation omitted)).

[13] *Dixon v. MARTA*, 242 Ga. App. 262, 266(4) (529 SE2d 398) (2000) (emphasis added).

[14] *Daker v. State*, 300 Ga. 74, 76(2) (792 SE2d 382) (2016) (punctuation omitted). See Stephen Louis A. Dillard, *Open Chambers Revisited: Demystifying the Inner Workings and Culture of the Georgia Court of Appeals*, 68 Mercer L. Rev. 1, 7(II) (2016) ("The quickest way to sabotage your appeal is to fail to substantiate legal

2. Next, the Neals contend the trial court erred in finding Metro Contents was not a "motor carrier" as defined in the GMCA; and so, it was not required to be licensed under the Act.[15] Again, we disagree.

Before addressing this claim of error, we must again address the shortcomings of the Neals' briefing on appeal. In the 15 or so pages of their brief addressing this claim of error, the Neals make *many* factual allegations but they provide only a single record citation.[16] As we have explained, this Court will not "cull the record on behalf of a party, particularly in a case such as this where the record is voluminous."[17] Indeed, this case has a 1,939-page record and 13 deposition transcripts. We have *repeatedly* advised litigants that "[a]ppellate judges should not be expected to take pilgrimages into records in search of error without the compass of citation and arguments or key factual or procedural assertions.").

[15] The Neals present this argument as separate claims of error, but they address them together

[16] See CT. APP. R. 25(a)(5) (providing that an appellant's brief must include "[a] statement of the case that sets out the material facts relevant to the appeal ... *with appropriate citations to the record*" (emphasis added)). While the Neals provide sparse record citations to the procedural history of this case and a few pleadings, they do not offer citations to any *evidence* in support of their factual allegations.

[17] *Callaway v. Willard*, 351 Ga. App. 1, 5(1) (830 SE2d 464) (2019) (punctuation omitted)).

argument."[18] So again, we caution the Neals that "if we have missed something in the record or misconstrued an argument, the responsibility rests with [their] counsel."[19] Lastly, if the Neals have not adequately identified the evidence necessary to decide this appeal, we will assume the trial court's findings are correct.[20]

Turning to the substance of the Neals' claim of error, we begin our analysis of the GMCA "with familiar and binding canons of construction."[21] And in considering a statute's meaning, our charge is to "presume that the General Assembly meant what

---

[18] *Bennett v. Quick*, 305 Ga. App. 415, 416 (699 SE2d 539) (2010) (punctuation omitted).

[19] *Pneumo Abex, LLC v. Long*, 357 Ga. App. 17, 18 n.3 (849 SE2d 746) (2020) (punctuation omitted).

[20] See *Austell Healthcare*, 308 Ga. App. at 395(1) (holding that when the alleged error "is shown only in the appellant's brief and not by the record, we must assume that the trial court's rulings were correct" (quotation marks omitted)). Throughout their brief, the Neals make conclusory statements as to their *interpretation* of the GMCA's "purpose" and provisions without citing any supporting legal authority. See *Morton v. Macatee*, 345 Ga. App. 753, 757(1)(a) (815 SE2d 117) (2018) (deeming a claim of error abandoned when the appellant failed to provide even a single citation to legal authority, in violation of our rules). Needless to say, we consider these statements only if they are supported by the plain language of the statute. See infra note 23 & accompanying text.

[21] *Holcomb v. Long*, 329 Ga. App. 515, 517(1) (765 SE2d 687) (2014).

it said and said what it meant."[22] So, we must afford the statutory text its "plain and ordinary meaning,"[23] consider the text contextually,[24] read the text "in its most natural and reasonable way, as an ordinary speaker of the English language would,"[25] and seek to "avoid a construction that makes some language mere surplusage."[26] And when the language of a statute is "plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly."[27]

---

[22] *Deal v. Coleman*, 294 Ga. 170, 172(1)(a) (751 SE2d 337) (2013) (citation and punctuation omitted). Accord *Arby's Restaurant Group, Inc. v. McRae*, 292 Ga. 243, 245(1) (734 SE2d 55) (2012).

[23] *Deal*, 294 Ga. at 172(1)(a) (punctuation omitted). See *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies)[.]").

[24] See *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 10(II)(B) (133 SCt 2247, 186 LE2d 239) (2013) (Scalia, J.) ("Words that can have more than one meaning are given content, however, by their surroundings." (citation and punctuation omitted)); *Deal*, 294 Ga. at 172(1)(a) ("[W]e must view the statutory text in the context in which it appears[.]").

[25] *Deal*, 294 Ga. at 172–73(1)(a).

[26] *Ga. Transmission Corp. v. Worley*, 312 Ga. App. 855, 856 (720 SE2d 305) (2011).

[27] *Martinez v. State*, 325 Ga. App. 267, 273 (750 SE2d 504) (2013) (punctuation omitted).

Significantly, the GMCA provides that

the for-hire transportation of persons and property [is] a privilege that require[s] close regulation and control to protect public welfare, provide[s] for a competitive business environment, and provide[s] for consumer protection.[28]

Under the GMCA, a "carrier" is "a person who undertakes the transporting of goods or passengers for compensation."[29] And importantly, a "motor carrier" is

[e]very person owning, controlling, operating, or managing any motor vehicle, including the lessees, receivers, or trustees of such persons or receivers appointed by any court, *used in the business of transporting* for hire persons, household goods, or property or engaged in the activity of nonconsensual towing pursuant to Code Section 44-1-13 for hire over any public highway in this state.[30]

Lastly, under the Act, "for compensation" or "for hire" means "an activity relating to a person engaged in the transportation of goods or passengers for compensation."[31]

---

[28] OCGA § 40-1-51.

[29] OCGA § 40-1-100(1).

[30] OCGA § 40-1-100(12)(A) (emphasis added).

[31] OCGA § 40-1-100(8).

Here, it is undisputed that Metro Contents is not licensed as a motor carrier under the GMCA, and the Neals describe its business as an "unlicensed moving company." This matters because under OCGA § 40-1-102,[32] "[a]ny contract entered into in violation of [the GMCA] shall be void and unenforceable."[33] Indeed, no motor carrier of "passengers or *household goods* shall, except as otherwise provided in this part, operate without first obtaining from the commissioner a certificate or permit."[34] The issue before us, then, is whether Metro Contents constitutes a "motor carrier of ... household goods" for hire such that it was required to be licensed under the GMCA.

In granting Metro Contents's motion for partial summary judgment, the trial court concluded that "[t]aken together, it is clear from the plain language of the [GMCA] that the term 'motor carrier' depends ... on the definitions of '*in the business of* transporting for hire.'"[35] And while the phrase "in the business of" is not defined

---

[32] In quoting this statute, the Neals reference OCGA § 40-2-102, but given the quote and their brief as a whole, this appears to be a typographical error.

[33] OCGA § 40-1-102(b).

[34] OCGA § 40-1-102(a) (emphasis added).

[35] (Emphasis added). Cf. *Hughes v. Ace Am. Ins. Co.*, 368 Ga. App. 650, 652–53 (888 SE2d 341) (2023) ("Taken together, it is clear from the plain language of the

in the statute, we have explained that "[e]xcept when considering a technical term or term of art in a particular industry, Georgia courts often begin by considering how a word has been defined in dictionaries to determine its plain and ordinary meaning."[36] In this respect, as noted by the trial court, the Merriam-Webster Dictionary defines the phrase "in the business of" as "to have (something) as one's job or *purpose*";[37] and the Oxford English Dictionary defines the colloquial use of the phrase as "to be engaged or involved in, to be concerned with."[38] Importantly, transporting household goods is not the stated (or actual) *purpose* of Metro Contents's business. Indeed, the trial court found that Metro Contents was not a "moving company" engaged in the business of transporting household goods for hire; but the company is in the business

[GMCA] that the term 'motor carrier' depends in turn on the definition of 'for hire,' which in turn depends upon the definition of 'passenger' found in OCGA § 40-1-100 (13).").

[36] *Catoosa County v. Rome News Media*, 349 Ga. App. 123, 128 (825 SE2d 507) (2019).

[37] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/in%20the%20business%20of (last visited May 27, 2026) (emphasis added).

[38] Oxford English Dictionary 1873 (3d ed. 2012). Cf. Black's Law Dictionary 192 (7th ed. 1999) (defining "business" as "[a] commercial enterprise carried on for profit; a *particular* occupation or employment *habitually* engaged in for livelihood or gain" (emphasis added)).

13

of repairing and restoring goods; and transporting those goods to storage is merely an "ancillary" part of its services. As a result, the court concluded that Metro Contents was not required to be licensed under the GMCA. In making these findings, the court relied on *Hughes v. Ace American Insurance Company*,[39] which it rightly found analogous to this case.

In *Hughes*, a seven-passenger Dodge Caravan driven by an employee of the company at issue[40] collided with a truck driven by the plaintiff.[41] The company's mission was "to be the best diversified health and human services provider in serving populations of various needs in our communities; creating optimal environments that foster independence, safety, and outcomes, through best-in-class services, an innovative and technology-led approach, and highly engaged people."[42] And relevant to transportation, the Dodge Caravan was "used to drive residents of [a] group home to medical appointments, a drug store to pick up prescriptions, the grocery or a big

---

[39] 368 Ga. App. 650 (888 SE2d 341) (2023).

[40] See id. at 651. This case involved two companies, but one is a subsidiary of the other. See id. at 653. For ease of reference, we refer to them collectively as a single company.

[41] See id. at 651.

[42] Id. at 653 (punctuation omitted).

14

box store, the library, a park, special events, or just a ride if a resident was restless."[43] Indeed, at the time of the accident, the driver "was transporting a resident back to the group home ...."[44] Under these circumstances, we affirmed the trial court's grant of summary judgment to an insurance-company defendant, finding that the company did not qualify as a "motor carrier" within the meaning of the GMCA.[45] So too here.

Even so, the Neals contend the *only* services Metro Contents performed for them were packing, transporting, and storing their property. But significantly, Betty averred that, after the *fire*, Metro Contents was "brought to the house to *recover [their] household goods that were salvageable*" and transport them to a storage space.[46] The Neals also presented testimony of an expert and consultant in the "packing and moving industry," and he testified that Metro Contents is a "remediation company." The expert—who works for Bulldog Movers—also testified that, while there are

---

[43] Id. at 654.

[44] Id. From the record before us, the reason for this trip could not be determined. See id.

[45] See id. at 651. In doing so, we cited testimony that transporting patients was merely "ancillary to [the company's] primary function of operating residential homes for disabled individuals." Id. at 654.

[46] (Emphasis added).

"countless" companies engaged in packing and moving services, Metro Contents is *not* one of his competitors. Finally, during oral argument, the trial court asked the Neals' counsel the following: "So your ... contention is that [the Neals] hired Metro for the purpose of transportation when in actuality they hired them for the purpose of cleaning their objects." In response, counsel told the court that the Neals hired Metro Contents "to store and clean their stuff." The Neals' counsel did not contend they hired Metro Contents *for the purpose of* transporting their property.

The record shows, then, that Metro Contents is a company *in the business of* cleaning and restoring salvageable, damaged property, and—similarly to the company in *Hughes*—transporting property to its storage facility is merely ancillary to the stated purpose of its business. Under these circumstances, we agree with the trial court that Metro Contents does not qualify as a "motor carrier for hire" within the meaning of the GMCA; and so, it was not required to be licensed under the Act.

For these reasons, we affirm the trial court's grant of Metro Contents's motions for partial summary judgment.

*Judgment affirmed. Gobeil and Pipkin, JJ., concur.*