**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**October 26, 2012**

# In the Court of Appeals of Georgia

A12A1655. YOUNG et al. v. GEORGIA AGRICULTURAL
EXPOSITION AUTHORITY et al.

ADAMS, Judge.

Maynard "Tony" Young and Laura Young appeal from the trial court's order granting summary judgment to the Georgia Agricultural Exposition Authority ("GAEA")[1] on Tony's claim for economic loss resulting from injuries he suffered when he was trampled by two bulls at a beef exposition at the Georgia Agricultural Center in Perry, Georgia. Because we find that Tony presented sufficient evidence to raise a jury issue on his claim for economic loss, we reverse the trial court's order granting summary judgment on that claim.

---

[1] The Georgia Cattlemen's Association, a.k.a. the Beef Breeds Council of the Georgia Cattleman's Association ("GCA"), also filed a brief on appeal, but the appellate record contains no indication that the GCA joined in GAEA's motion for summary judgment.

This is the third appearance[2] of this case before this Court, and we previously set out the facts underlying the Youngs' claims as follows:

> Tony Young and his wife sued Ronnie Shelby and others to recover for injuries inflicted on Young by two bulls owned and raised by Shelby. . . . Both Young and Shelby are experienced cattlemen who were displaying bulls during a beef exposition at fairgrounds in Perry [on April 2, 1998.] Young helped unload Shelby's two bulls from the trailer in which they were being transported into a pen. To accomplish this task, Shelby released the bulls from the trailer, and Young manned the gate of the pen into which the bulls were supposed to run. Instead of entering the pen, however, the first bull collided with a panel on the gate, which broke loose and impaled Young's upper thigh. After being thrust to the ground, Young was trampled and kicked by the bulls.

*Young v. Shelby*, 255 Ga. App. 707, 708 (566 SE2d 426) (2002).

In considering the Youngs' current appeal from the grant of GAEA's motion for summary judgment, we review the evidence de novo, and we construe all

---

[2] The trial court granted summary judgment to Shelby on the Youngs' claims, and this Court affirmed that judgment in *Young v. Shelby*, 255 Ga. App. 707 (566 SE2d 426) (2002). And in *Young v. Georgia Dept. of Natural Resources*, 297 Ga. App. 456, 457 (677 SE2d 309) (2009), this Court vacated the trial court's order dismissing the Youngs' complaint for failure to comply with the ante litem notice statute, OCGA § 50-21-26, and remanded the case for the trial court's consideration of recent Georgia Supreme Court precedent.

reasonable conclusions and inferences drawn from the evidence in the light most favorable to the Youngs as nonmovants. *Congress Street Properties v. Garibaldi's,* 314 Ga. App. 143, 145 (723 SE2d 463) (2012). Viewing the evidence in this light, the record shows that Tony had been in the cattle business with his father since he was in high school. Over the years, they raised both commercial cattle, sold by the pound, and registered cattle, the market value of which depends upon the quality and characteristics of the individual animal. In an effort to maximize the output of calves from the registered cattle, Tony trained to be a cattle embryologist. He employed his skills to "superovulate" cows, that is, to cause a cow to "have a multiovulation so you can recover embryos from her uterus," and then implant those embryos in other cows. Tony stated that this process was an essential part of the registered cow business, because, for example, if a cow produces a $5,000 calf, through the process of embryo transfer, "you have 10 of them born a year instead of one."

In addition to his own cows,[3] Tony provided embryology-related services to other cattlemen for a fee. He said that he averaged four of these outside appointments

_____

[3] When he lost the ability to perform these procedures after the accident, Tony found that it was less profitable to hire others to perform these services on his own farm's cows. But Tony apparently does not seek compensation for any losses arising from his inability to provide embryology services to his own cattle.

per month, and although the fees varied, he averaged a net fee of $600 per visit. Therefore, he stated that he grossed approximately $60,000 per year from his side embryology business during the period 1986 to 1998 and netted approximately $26,000 to $28,000 per year. He explained that he generally cleared around 50 percent of the amount he was paid for this business. Tony initially had a separate breeding service company for this work, but he closed that business and later ran the income through either his personal account or through the cattle business he ran with his father.

As a result of the 1998 incident with the bulls, Tony Young's right femoral vein was punctured, and he suffered a torn left rotator cuff. The Youngs contend that the rotator cuff injury prevents him from working as a cattle embryologist, which requires the use of both arms, and Tony seeks to recover the resulting economic loss on his outside cattle embryo business.

Although Tony was not able to locate specific records relating to his embryology business in support of this claim, he furnished joint income tax returns he filed with his wife in 1996 and 1997, in addition to other returns filed after his accident. The 1996 return reflects income of $58,821 from "Sales of livestock, produce, grains, and other products you raised" and $8,851 in other income, which

4

a separate schedule identifies as income from "medicine and semen embryos" and "labor," for a total gross income of $67,672. This information was included in Schedule F of the return, used for calculating the "Profit or Loss from Farming." Tony's accountant, who did not prepare the 1996 return, testified in his deposition that he believed that all this income may all have been related to the cattle embryo business, because Tony implanted embryos into his own cows and sold the resulting calves. The accountant said that the entry for the sale of livestock on Schedule F probably reflected the sale of such cattle, because Tony's sale of breeder cattle was reflected on a separate schedule as a capital gain. The 1996 Schedule F also reflected Tony's share of the farm expenses, which when applied against the gross income resulted in a net farm income for Tony in 1996 of $12,042.

The 1997 return reflects net farm income of $25,545, and the Schedule F for that year reflects income from the sale of livestock in the amount if $87,533 and "other income" of $2,430. Although the return did not include a schedule explaining the source of that income[4] and the accountant did not prepare the return, he assumed

_____

[4] Tony's accountant explained that the office's program for preparing these returns changed that year and it did not generate a separate schedule.

from his knowledge of Tony's business that the income would have related to the cattle embryo business.

In contrast, the tax returns for the years after the accident reflect no "other income" on Schedule F. The Youngs' tax return for 1998, the year of his injury, reflects only $5,166 in income from the sale of livestock and nothing else, and overall, Tony's farm activity resulted in a loss for the year. The record contains no return for 1999, and the Youngs' returns for the following years reflect net losses or, in one year, a profit under $500 from the farming operation until 2004, when the net profit was $27,316. In 2005, however, the profit again dipped below $300.

GAEA's motion for summary judgment asserted that this evidence was too speculative to allow a jury to ascertain Tony's economic loss. Following briefing and a hearing, the trial court agreed, noting that the Youngs' tax returns reflected no wages during the pertinent years and finding that:

> Mr. Young's claims for lost wages and lost profits are very speculative and imprecise. Mr. Young has no ascertainable basis for determining lost profits or income, and in reading his deposition, it appears that his figures are generally very speculative and he often refers to them as "guesstimates." . . . [A]ll of the deposition testimony and other claims by the Plaintiff and his accountant indicated a total and complete

6

inability to specifically calculate any lost wages or profits as required by law in order to recover same.

On appeal, the Youngs argue that the trial court erred in granting GAEA's motion for summary judgment because the evidence is sufficient to create a jury issue on this claim. We agree.

To properly consider the issue on appeal, we must first ascertain the nature of Tony's claim for economic loss. GAEA's motion attempted to characterize the claim primarily as one for lost profits.[5] The trial court's order addresses both lost profits and lost wages.[6] But neither of these characterizations is strictly accurate given the nature of Tony's embryology work. Tony seeks to recover losses for income that he would

---

[5] Georgia law generally requires a higher level of proof to establish lost profits. See *Johnson County School Dist. v. Greater Savannah Lawn Care*, 278 Ga. App. 110, 112 (629 SE2d 271) (2006) (general rule is that recoverability of lost profits is that such damages are not recoverable as they are too speculative, remote, and uncertain); *MTW Inv. Co. v. Alcovy Properties*, 228 Ga. App. 206, 207 (1) (a) (491 SE2d 460) (1997) (profits recoverable in tort action "are limited to *probable*, as distinguished from *possible* benefits") (emphasis supplied); *Kingston Pencil Corp. v. Jordan*, 115 Ga. App. 333, 335 (2) (154 SE2d 650) (1967) (lost profits must be capable of definite ascertainment).

[6] Although GAEA asserts that the complaint sought lost wages, the complaint is not included in the record on appeal. But even if the complaint asserted a claim for lost "wages," Tony would not be barred from seeking to recover earnings he lost as a result of his injuries under the notice pleading standard.

7

have received for his cattle embryo services. He did not receive "wages" for this work because he was not an employee of the business; instead, he received a fee. Thus, it is understandable that he did not report this income as wages on his income tax return. Moreover, the evidence indicates that at times he ran the cattle embryo income through the farming business he shares with his father, and in 1996 and 1997, he apparently reported this income on the schedule for calculating the farming profit and loss. Although the income he receives "for such services could be characterized as profits in a generalized sense, the damages he seeks in *tort* are for his *lost earnings* during the . . . period he was unable to work" as a cattle embryologist. (Emphasis in original.) *Dossie v. Sherwood*, 308 Ga. App. 185, 187 n. 8 (707 SE2d 131) (2011) (addressing loss of earnings claim for independent delivery truck driver).

"In Georgia, the loss of one's earnings from the date of injury to the date of trial as a result of a personal injury is a separate and distinct pecuniary damage that is recoverable, so long as the amount can be determined with reasonable certainty." (Footnote omitted.) *Dossie v. Sherwood*, 308 Ga. App. at 188. See also *Douglas v. Rinker*, 134 Ga. App. 949, 950 (216 SE2d 629) (1975). Thus, Tony can recover his lost earnings "so long as causation is established and the amount sought is sufficiently proven." *Dossie v. Sherwood*, 308 Ga. App. at 187 n. 8 (and cases cited therein). The

8

amount of such damages is for the jury to determine, even if calculating the exact measure of such damages presents a challenge:

> [I]f it has been sufficiently established that the loss of earnings was caused by the tortious conduct of the defendant, the fact that the exact measure of the earnings lost may be challenging for the jury to calculate does not preclude their recovery. As we have previously explained,
>
>> [t]he rule against the recovery of vague, speculative, or uncertain damages relates more especially to the uncertainty as to cause, rather than uncertainty as to the measure or extent of the damages. Mere difficulty in fixing their exact amount, where proximately flowing from the alleged injury, does not constitute a legal obstacle in the way of their allowance, when the amount of the recovery comes within that authorized with reasonable certainty by the legal evidence submitted.

(Punctuation omitted.) Id. at 188, quoting *Crosby v. Spencer*, 207 Ga. App. 487, 488 (1) (428 SE2d 607) (1993).

And as *Dossie* recognized,[7] Georgia law has long acknowledged the difficulty faced by an individual such as Tony "who happened to be laboring not for a fixed and definite salary, but for fees or commissions" in establishing a claim for lost earnings.

---

[7] *Dossie v. Sherwood*, 308 Ga. App. at 187, n. 8.

*Southwestern R.R. Co. v. Vellines,* 14 Ga. App. 674, 688–689 (82 SE 166) (1914). The law, therefore, provides a more liberal requirement of proof under such circumstances and "[w]here by the very nature of things no better evidence is available or possible of production, the law perforce contents itself with proof of past average earnings, not always perhaps as proof of actual lost profits, *but as illustrating the earning capacity of the plaintiff,* and hence the value of his lost time." (Emphasis supplied.) Id. (acknowledging that "[i]t is well-nigh impossible to furnish absolutely precise evidence as to the probable earnings of a professional man").

Here, Tony testified as to the average gross and net amounts he earned for his cattle embryo business during the period 1986 to 1998. He also presented tax returns from 1996 and 1997 reflecting income from the embryo business, and returns from 1998 forward showing no income from this business. Although it is unclear from the tax returns alone what portion of the farm expenses on the Schedules F for 1996 and 1997 were attributable to the embryology business, Tony testified that he generally cleared 50% of the income from this sideline. And even though the 1996 and 1997 tax returns appear to conflict with his testimony about average earnings, Tony acknowledged that he may not have been doing as much outside embryology business

10

during that time period.[8] In any event, it is for the jury to weigh witness credibility and to resolve such conflicts in the evidence. See *Williams v. Capitol Corporate Cleaning*, 313 Ga. App. 61, 65 (2) (720 SE2d 228) (2011); OCGA § 24–9–80.

We conclude that this evidence was sufficient to present a jury issue on Tony's economic loss claim. See *Olariu v. Marrero*, 248 Ga. App. 824 (549 SE2d 121) (2001) (evidence of past earnings plus evidence of accepted job offer plaintiff could not fulfill after accident sufficient to allow jury to determine past and future earnings) (physical precedent only); *Gipson v. Phillips*, 232 Ga. App. 235 (501 SE2d 570) (1998) (testimony from injured plaintiff and wife as to amount retired plaintiff earned and cleared from odd jobs sufficient to determine "probable lost profits").[9] Cf. *Quiktrip Corp. v. Childs*, 220 Ga. App. 463 (469 SE2d 763) (1996) (testimony and tax returns and evidence of present earnings sufficient to enable the jury to establish

---

[8] Moreover, we note that these returns addressed only two years of the twelve-year period covered by Tony's testimony.

[9] Although the *Gipson* decision uses the term "lost profits," the recovery sought in that case might more accurately be described as "lost earnings."

lost wages). Accordingly, the trial court erred in granting GAEA's motion for summary judgment as to Tony's economic loss claim.[10]

*Judgment reversed. Barnes, P. J., and McFadden, J., concur.*

---

[10] Although GAEA argues in its supplemental brief that testimony from Tony's doctor casts doubt that Tony's injury prevents him from his work as a cattle embryologist and thus that his injury is not the cause of his lost earnings, GAEA failed to raise this issue on summary judgment below and thus the Youngs were not given an opportunity to address it before the trial court. Accordingly, we cannot consider it on appeal. See *Knight v. American Suzuki Motor Corp.,* 272 Ga. App. 319, 325-326 (2) (612 SE2d 546) (2005) (summary judgment improper where nonmovant is not given full and fair notice and an opportunity to respond to particular ground). Moreover, because Tony testified that his injury did prevent him from doing this work, the doctor's testimony would only serve to create a jury issue and thus would not authorize summary judgment on this ground.