**FOURTH DIVISION
DILLARD, C. J.,
MCFADDEN, P. J. AND RAY, J.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**March 12, 2018**

# In the Court of Appeals of Georgia

A17A1515. MERCER UNIVERSITY v. STOFER et al.

RAY, Judge.

Mercer University filed this interlocutory appeal from the trial court's partial denial of its motion for summary judgment in a wrongful death case related to a slip-and-fall that occurred during a free concert hosted by the university.[1] Mercer contends that the trial court erred in determining that a jury question existed as to the facts underlying whether the Recreational Property Act, OCGA § 51-3-20 et seq. (the "RPA"), should apply to immunize Mercer from liability. Mercer also argues that the trial court erred in deciding that fact questions remained on the issue of traditional

---

[1] The trial court granted Mercer's motion for summary judgment, in part, on the plaintiffs' claims for negligence per se and attorney fees and expenses of litigation under OCGA § 13-6-11.

premises liability. For the reasons that follow, we affirm the trial court's partial denial of summary judgment to Mercer.

"In an appeal from the grant or denial of a motion for summary judgment, we apply a de novo standard of review, viewing the evidence, including any reasonable conclusions and inferences that it supports, in the light most favorable to the nonmovant." (Citation and punctuation omitted.) *Henderson v. St. Paul Baptist Church*, 328 Ga. App. 123, 123 (761 SE2d 533) (2014). Thus, we view the evidence in the light most favorable to the plaintiffs-appellees, John Stofer, as executor of his mother Sally Stofer's estate, and John Stofer and Susan Stofer Chandler, individually, as Sally Stofer's surviving children (collectively, "the Stofers").

The evidence shows that Sally Stofer and her sister, Carol Denton, were attending a free concert at Washington Park in Macon in July 2014. The park is owned by Macon-Bibb County, but Mercer had a permit to use the park. Mercer paid no rent to use the park for the concert at issue, although Mercer did pay for security and maintain liability insurance. The concert was part of Mercer's "Second Sunday" concert series, which was planned, promoted and hosted by Mercer's College Hill Alliance, a division of Mercer.

When Stofer and Denton arrived, they parked at street level above Washington Park and descended a concrete stairway to gain entrance to the venue. Denton deposed that they searched for a way to enter the park and chose the stairway at issue because it had a handrail at the top where they began their descent. After progressing partway down the steps, Stofer and Denton exited the stairs and found a place to sit on the grassy hill. Although there were vendors at the park selling food and drink, Stofer did not purchase anything.

When they decided to leave the concert, Stofer and Denton used the same set of steps they had used to enter the venue. They began to ascend those steps at the bottom, below the halfway point where they had left the steps when they first arrived at the concert. They had not previously traversed this lower part of the stairway, and Denton deposed that it lacked a handrail. However, there was no other means of returning to their car at the top of the stairs because none of the other stairways at the park had handrails and the grassy hill leading up to their car was too slippery and hard to ascend. Denton ascended the stairs ahead of Stofer, and when she turned to check on her sister, she saw Stofer lose her balance, fall backward, and hit her head on a part of the stairs that had no handrail. The impact caused profuse bleeding. Stofer apparently never regained full consciousness. She fell into a coma and eventually was

3

removed from life support, pursuant to her wishes in an advance directive. She died on August 28, 2014.

Stofer's children and her estate filed this wrongful death action asserting, inter alia, claims of negligence and premises liability. Mercer moved for summary judgment, arguing, inter alia, that it is immune from liability under the RPA and that Stofer cannot show that the university had superior knowledge of the hazard. The trial court denied Mercer's motion as to immunity under the RPA and as to premises liability, and Mercer filed this interlocutory appeal.

1. Mercer contends that the trial court erred in ruling that the RPA did not bar the Stofers' claims, arguing that the event was solely recreational.

"The purpose of [the RPA] is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting the owners' liability toward persons entering thereon for recreational purposes." OCGA § 51-3-20. Under the RPA, except as provided in OCGA § 51-3-25, "an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes or to give any warning of a dangerous condition, use, structure, or activity on the premises to persons entering for recreational purposes." OCGA § 51-3-22. Further, except as provided in OCGA § 51–3–25,

4

an owner of land who either directly or indirectly invites or permits without charge any person to use the property for recreational purposes does not thereby: (1) Extend any assurance that the premises are safe for any purpose; (2) Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed; or (3) Assume responsibility for or incur liability for any injury to person or property caused by an act of omission of such persons.

OCGA § 51-3-23.[2]

Here, it is undisputed that Stofer and her sister were not charged to attend the concert. In cases where there is no dispute over whether the activity at issue was purely recreational, this fact would end our inquiry. See *Mayor and Aldermen of Garden City v. Harris*, __ Ga. __ *2 (Case No. S17G0692, decided January 29, 2018) (hereinafter "*Harris II*") ("a natural reading of the plain language of OCGA § 51-3-23 indicates that a landowner remains free from potential liability to any individual person . . . who has been allowed to use the property *for recreational purposes* free of charge") (emphasis supplied). The case which *Harris II* reversed, *Mayor and Aldermen of the City of Garden City v. Harris*, 339 Ga. App. 452, 454 (793 SE2d 628) (2016) (hereinafter "*Harris I*"), makes clear that the parties agreed that the

---

[2] We note that under the RPA, an "owner" means the possessor of a fee interest, a tenant, a lessee, an occupant, or a person in control of the premises.

5

spectators, including the plaintiff, were using the stadium at issue for recreational purposes within the meaning of the RPA. However, neither *Harris I* nor *Harris II* addressed any dispute regarding the *defendant's purpose* in offering the venue, or examined whether issues of mixed recreational and commercial use existed, as these matters appear not to have been squarely presented to the Courts.

In the instant case, the primary point of dispute between the parties is Mercer's purpose in inviting the public to the free concert, as the plaintiffs contend there was a mixed commercial and recreational purposes of the venue. While Mercer contends that its purpose in inviting the public to the free concert was solely recreational, the Stofers counter that because, among other things, private vendors sold food and alcohol at a profit and Mercer derived revenue from corporate sponsorships, "*Mercer's purpose in holding this concert series was to promote its private interests*,

as well as the commercial interests of businesses abutting its campus."[3] (Emphasis

supplied.)

In cases such as the one before us where the defendant's purpose for inviting

the public to the event free of charge is in dispute, the Supreme Court has held over

the course of approximately 50 years that it is not just the *plaintiff's purpose in using*

*the venue*, but also the *defendant's purpose in offering it* that must be considered in

determining the applicability of the RPA.

> The important criterion is the *purpose for which the public is permitted*
> on the property. *If the public is invited to further the business interests*
> *of the owner* – e. g., for sales of food, merchandise, services, etc. – the
> RPA will not shield the owner from liability even though the public
> receives some recreation as a side benefit.

*Cendeno v. Lockwood*, 250 Ga. 799, 801 (2) (301 SE2d 265) (1983), overruled on

other grounds by *Atlanta Committee for the Olympic Games, Inc. v. Hawthorne*, 278

---

[3] We note that in its order denying partial summary judgment to Mercer, the trial court stated that both parties agreed that "attending a free concert is an activity that falls within the definition of 'recreational purposes' under the RPA." However, we did not find this in the record. Both parties' filings and argument on summary judgment, and briefs on appeal, along with the trial court's order itself, make clear that, at least as to Mercer's purpose, this issue remains very much in dispute. See OCGA § 51-3-21 (4). The record does show that Mercer acknowledged that the university was an owner and occupier of Washington Park for purposes of premises liability. See OCGA § 51-3-21 (3).

7

Ga. 116, 118 (1), n. 3 (598 SE2d 471) (2004). Compare *Bourn v. Herring*, 225 Ga. 67, 67-68 (1) (a) (166 SE2d 89) (1969) (even where property has been made available to the public "for advertising purposes and to promote the sale of the [property owner's] products" it still may fall within RPA protections).

As the Supreme Court more recently determined in *Anderson v. Atlanta Committee for the Olympic Games, Inc.*, 273 Ga. 113 (537 SE2d 345) (2000),[4] in cases where the purposes are a mix of recreational and commercial, "an *owner's profit motive* does not necessarily create a reasonable inference that the event is commercial rather than recreational in nature. Rather, it is the *purpose for which the owner earned the profits*." (Emphasis supplied.) Id. at 116 (2).

In *Anderson*, the Supreme Court adopted a balancing test which required that "*all social and economic aspects* of the activity be examined. Relevant considerations of this question include, without limitation, the intrinsic nature of the activity, the type of service or commodity offered to the public, and the *activity's purpose* and

_____

[4] In *Anderson*, supra at 114, and its successor, *Hawthorne*, supra at 116, the Supreme Court analyzed the RPA's applicability in actions for wrongful death and personal injuries against the Atlanta Committee for the Olympic Games ("ACOG") arising from the bombing at Centennial Olympic Park during the 1996 Olympic Games.

8

consequence." (Citation omitted; emphasis in original.) Id. at 117 (2). This balancing test is to be applied by the fact-finder. *Hawthorne*, supra at 117. Stated in more detail,

> whether the RPA applies to limit the liability of the owner of a certain property at a certain time is a question of law for the trial court. However, determination of the purpose for which the public was permitted on the property involves the examination and weighing of evidence in those instances in which there exist both commercial and recreational aspects to the property at issue. Where that evidence conflicts regarding the purpose of the property, it is for the fact finder to resolve the conflict.

(Citations and punctuation omitted.) Id. at 117 (1).

Here, the record shows that Mercer advertised the concert series on the College Hill Alliance web site by promising food for purchase, a live band, and a cash bar. Mercer's expense estimates for the concert series indicate that it paid for musicians, professional sound technicians, a stage canopy, portable toilets, and professional marketing. Several restaurants were on-site at the July 2014 concert at issue, selling food and alcohol. They did not pay Mercer, nor did Mercer pay them, to operate at the concert. The program coordinator for College Hill Alliance, J. R. Olive, deposed that the restaurants sold food and alcohol at a profit. Concert-goers were not required to buy food and drinks, and were encouraged to bring their own picnics. Although the

9

College Hill Alliance was completely grant-funded at the time of the concert, the expenses of the multi-year concert series had, at certain points in time, been defrayed by corporate contributions, grants, a sponsorship from State Bank & Trust, as well as sponsorships from a law firm and other local businesses. During the concert at issue, earlier sponsors' advertisements appeared on banners and tents.

Part of the stated mission of Mercer's College Hill Alliance is to foster neighborhood revitalization, although Olive deposed that the concert series also benefitted Mercer by improving the College Hill Corridor, making the university more attractive to potential students, and providing branding opportunities. Specifically, in a grant proposal form Mercer filled out when seeking $2.2 million in grant money from the Knight Foundation for the College Hill Alliance, the university wrote that

> As a private institution, Mercer has the capacity for direct and effective interaction with other local community economic development resources[] . . . [which could create] *the potential for additional revenue streams for the University*. The Alliance will encourage and support efforts at Mercer to utilize the academic and research capacity of the university to drive economic development.

(Emphasis supplied.)

As the Supreme Court determined, "[t]he owner's ipse dixit regarding the purpose for making the property available free of charge is an important factor. However, it is no more controlling than the user's subjective assessment of the activity[.]" (Citations omitted.) *Hawthorne*, supra at 117 (1). Thus, it is clear that the owner's purpose must be considered, even where the plaintiff was not charged to enter the property, so long as the issue of whether the property's use was purely recreational is disputed, or,

> [e]ven where there is no factual dispute over the recreational and commercial activities that exist on the property, the nature and extent of the mixed uses of the property may nevertheless raise a jury question about the owner's *purpose* for directly or indirectly inviting or permitting without charge any person to use the property.

(Citations, punctuation, and footnote omitted; emphasis in original). Id. at 117 (1). See also *Harris II*, supra at *2, n. 1 (specifically not overruling prior RPA cases).

As the evidence outlined above amply demonstrates, fact questions remain as to Mercer's purpose in inviting the public to attend the free concert. Where the evidence shows the possibility for mixed commercial and recreational aspects of the property at issue, and where the owner's purpose is in dispute, a fact-finder must

11

resolve the conflict. *Hawthorne*, supra at 117 (1). In particular, Mercer's statement in its grant application that the funding, some of which was used for the concert series, would create "the potential for additional revenue streams to the University[,]" must be examined by a finder of fact. See generally *Anderson*, supra at 116 (2) (the purpose for which the profits are sought is relevant). A jury must assess whether the alleged commercial activity has some "profit-related nexus to the admitted public's presence on the premises or with its free use of the locus delicti." (Citations and punctuation omitted.) Id. at 119-120 (2) (finding that evidence that the ACOG derived financial benefits for pecuniary gain from the businesses that occupied Centennial Olympic Park, and that those businesses "gained untold advertising and promotional value due to their conspicuous presence in the Park," was relevant and admissible to the extent that it showed ACOG made the venue available to the public for free for the purpose of conducting a for-profit activity intended to involve the public). Further, the contextual evidence of the concert series' earlier funding through sponsorships is relevant, as is the current use of sponsors' banners and advertisements. See id. at 120 (3) (a jury's consideration of factual disputes related to the owner's purpose in making the property available free of charge may require consideration of a larger time frame than that covering just the moment of injury).

12

Thus, a fact question exists as to Mercer's purpose for holding the free concert series, which the jury must assess via objective evidence, "such as proof that [Mercer] knowingly obtained, directly or indirectly, financial benefits for the purpose of pecuniary gain from business interests on the property as a result of its decision to invite or permit the public without charge to enter the property." (Citation omitted.) *Martin v. Dempsey Funeral Svcs. of Ga., Inc.*, 319 Ga. App. 343, 346-347 (1) (735 SE2d 59) (2012) (finding fact questions existed where cemetery operator allowed public onto property free of charge for recreation such as picnics and jogging, but also was in the business of selling gravesites and interment rights). In the instant case, jury questions remain requiring the examination of "all social and economic aspects of the activity" and "the intrinsic nature of the activity, the type of service or commodity offered to the public, and the activity's purpose and consequence." (Citation, punctuation, and emphasis omitted.) *Anderson*, supra at 117 (2). The trial court did not err.[5]

---

[5] We note that our Supreme Court's opinion in the recently released *Harris II* case perhaps forecasts "troubled waters ahead" for the approach taken by the Supreme Court in both ACOG cases, but the Supreme Court specifically chose not to address that precedent or overrule it. Thus, we are bound to honor and apply the principles included therein.

2. Mercer also contends that the trial court erred in finding that fact questions remained as to its liability under traditional principles of premises liability. We agree with the trial court and affirm.

To succeed on a premises liability claim,

> the plaintiff must plead and prove that: (1) the defendant had actual or constructive knowledge of the hazard; and (2) the plaintiff, despite exercising ordinary care for his or her own personal safety, lacked knowledge of the hazard due to the defendant's actions or to conditions under the defendant's control. Thus, to carry its initial burden and to survive a motion for summary judgment, a plaintiff must provide evidence that, when construed in his or her favor, would enable a rational trier of fact to find that the defendant had actual or constructive knowledge of the hazard.

(Citation and punctuation omitted.) *Samuels v. CBOCS, Inc.*, 319 Ga. App. 421, 423 (742 SE2d 141) (2012). The burden then shifts to the defendant to show that the plaintiff's injury resulted from her own intentional disregard of a known risk or a failure to exercise ordinary care for her own safety. *American Multi-Cinema, Inc. v. Brown*, 285 Ga. 442, 445 (2) (679 SE2d 25) (2009). If the defendant makes this showing, the burden then shifts back to the plaintiff, who must produce evidence creating a genuine issue of material fact on the question of intentional disregard or

14

failure to exercise ordinary care, or evidence tending to show "that any such negligence resulted from the defendant's own actions or conditions under the defendant's control." (Footnote omitted.) Id.

(a) Mercer argues that "only speculation" exists as to the cause of Stofer's fall. The university contends that Denton said in a signed statement that she did not know what caused her sister to lose her balance, and that she deposed that her sister was dizzy.

However, as the Stofers point out in their appellate brief, Mercer did not raise the issue of causation below, and Mercer provides no citations to the record to indicate that this was preserved for our review, nor did the trial court address this contention of causation. See *OVIP, Inc. v. Blockbuster Textiles, LLC*, 289 Ga. App. 276, 278 (1) (656 SE2d 907) (2008) ("issues presented for the first time on appeal furnish nothing for us to review, for this is a court for correction of errors of law committed by the trial court where proper exception is taken") (citations and punctuation omitted).

We note that Mercer's characterization of Denton's remarks is correct insofar as it goes. Denton first deposed that she, herself, was concerned about becoming dizzy. Later, she stated, "I don't know why [Stofer] got dizzy[,]" then almost

15

immediately added, "I don't mean that[.]"[6] Denton had previously deposed that she suffered a stroke at some point after attending the concert, and that the stroke affected her speaking and memory. Denton also said in her pre-stroke statement and later in her deposition that she observed her sister staggering and "off balance[,]" that her sister's "feet were uneven where she was standing[,]" and that her sister's "arms [were] flapping trying to catch herself" but "there were no handrails. She hit hard."

Additionally, the Stofers' expert, a forensic engineer, deposed that Stofer lost her balance because of the "condition" of the stairs and was not able to regain it because of the missing handrail, then fell and struck her head. He specifically noted the "lack of a handrail[,]" and the "broken concrete and the raised surfaces" with "missing material on the tread surface" as conditions related to her inability to maintain her balance and prevent the fall.

As outlined above, there is evidence, both from Denton and from the expert, from which a jury could find that the uneven concrete and/or lack of a handrail was a cause of Stofer's injury. A jury must weigh and assess whether Denton's statements

---

[6] We note that as a non-party witness, Denton is not subject to the rule laid out in *Prophecy Corp. v. Charles Rossignol, Inc.,* 256 Ga. 27, 28 (1) (343 SE2d 680) (1986) on self-contradictory testimony. See *Thompson v. Ezor*, 272 Ga. 849, 851 (1), (2) (536 SE2d 749) (2000).

16

are contradictory and, if so, which statement to believe and what weight it should be accorded. *Young v. Ga. Agricultural Exposition Auth.*, 318 Ga. App. 244, 249-250 (733 SE2d 529) (2012) (the jury weighs witness credibility).

(b) Mercer also contends that Stofer did not meet her burden of showing that the university had superior knowledge of the hazard and, additionally, argues that Stofer had equal knowledge of the hazard.

"The principle of equal or superior knowledge is not limited to slip and fall cases, but applies to 'static' defective or dangerous conditions on property." (Citations and punctuation omitted.) *Newell v. Great Atlantic & Pacific Tea Co., Inc.*, 222 Ga. App. 884, 885 (2) (476 SE2d 631) (1996). "Constructive knowledge may be established by showing either that: (1) an employee of the proprietor was in the immediate area of the hazard and had the means and opportunity to easily see and remove it; or (2) the proprietor failed to exercise reasonable care in inspecting the premises." (Citation omitted.) Id., supra at 886 (2).

The Stofers presented evidence that Olive, the program coordinator for the College Hill Alliance which hosted the concerts, had traversed the stairs at issue many times, although he deposed that he had never noticed the lack of a handrail because he did not need to use one. While a jury would need to assess the credibility

17

of his statement about what he noticed, Olive's familiarity with the steps, coupled with the testimony about the poor condition of the steps and lack of railing from the Stofers' expert witness, is sufficient to present a fact question as to whether Mercer had actual or constructive knowledge of the hazardous condition. *Mac International-Savannah Hotel, Inc. v. Hallman*, 265 Ga. App. 727, 728-729 (1) (595 SE2d 577) (2004) (testimony that employees swept steps daily and pressure washed them quarterly, combined with expert testimony about condition of steps, were sufficient for factfinder to find actual or constructive knowledge).

Additionally, the Stofers presented evidence that Mercer never inspected the stairs for safety, despite having multiple opportunities to do so, and that Mercer had held concerts there since 2010. The Stofers' expert testified that grass was growing through the missing tread on the stairs, indicating the condition had existed for some time. Here, Mercer was, at least, on constructive notice of the condition of the steps and rail because an owner or occupier of land "is generally on constructive notice of what a reasonable inspection would reveal." *Hagadorn v. Prudential Ins. Co.*, 267 Ga. App. 143, 146 (598 SE2d 865) (2004) (reversing trial court's grant of summary judgment to defendant where a reasonable inspection would have revealed the slanted nature of cement surrounding a culvert and that the curb had not been painted yellow

18

or orange as a warning) . Thus, the trial court did not err in finding a question of fact as to whether Mercer used reasonable care in inspecting the steps.

(c) Mercer also argues that Stofer had equal knowledge of the hazardous condition.

Denton testified that she and her sister were unaware of the lack of railing on the lower part of the steps, which they had not traversed before, until they came right up to the steps, and that despite considering other ways to leave the park, the other stairways had no railing at all, so this appeared to be the best choice. Where the plaintiff must prove a lack of knowledge of the hazard despite exercising ordinary care, this burden "is not shouldered until the defendant establishes negligence on the part of the plaintiff – i.e., that the plaintiff intentionally and unreasonably exposed [her]self to a hazard of which the plaintiff knew or, in the exercise of ordinary care, should have known." (Citation and punctuation omitted.) *Davis v. GBR Props., Inc.*, 233 Ga. App. 550, 551 (1) (504 SE2d 204) (1998). Although there is evidence that Stofer knew the handrails were missing, there remains a fact question as to whether she was aware of the other conditions, including the broken concrete and missing treads, and, as the plaintiffs' expert testified, that even if she did notice those conditions, a question exists as to whether she understood that they were dangerous

19

such that she made an unreasonable decision to ascend the stairs. "[O]f course, we must follow our Supreme Court's admonition that the 'routine' issues of premises liability, i.e., the negligence of the defendant and the plaintiff, and the plaintiff's lack of ordinary care for personal safety are generally not susceptible of summary adjudication." (Citation and punctuation omitted.) Id. at 552 (1). In *Davis*, this Court found that although a plaintiff who fell while descending a handicap ramp had previously ascended it, "even if [plaintiff] was fully aware of the ramp and handrail, this does not establish that she knew or should have known of the hazard posed thereby, or that she intentionally and unreasonably exposed herself to the hazard by walking down the ramp." Id.

> The danger posed by a ramp is not as obvious at first glance as, say, that posed by a hole in the ground or a pool of oil on the floor. Accordingly, we cannot say that [the plaintiff] appreciated the dangers posed by the ramp[.] . . . [T]here is a difference between mere knowledge of a defect and full appreciation of the risk involved.

(Citations and punctuation omitted.) Id. The same holds true for the stairs at issue, where we cannot say that Stofer appreciated the dangers posed by the cracked and missing concrete, which caused the rise-and-run to be uneven on some parts of the stairs.

(d) Mercer also argues that the condition of the stairs was open and obvious in that nothing obstructed Stofer's view. Again, the fact that Stofer noticed the missing handrails does not mean she noticed or had knowledge of the potential danger from the combination of missing handrails, and broken or missing concrete and treads.[7] "It is a plaintiff's knowledge of the *specific* hazard which precipitates the slip and fall which is determinative, not merely [her] knowledge of the generally prevailing hazardous conditions[.]" (Citation and punctuation omitted; emphasis in original.) *Little v. Alliance Fire Protection, Inc.*, 291 Ga. App. 116, 121 (661 SE2d 173) (2008). Thus, a fact question exists as to whether Stofer exercised the requisite care for her own safety.

*Judgment affirmed. McFadden, P. J., concurs. Dillard, C. J., concurs dubitante.*

---

[7] As to this issue, we take note of the fact that Olive, the program coordinator, had traversed the stairs many times and apparently did not find them to be a danger.

A17A1515.  MERCER UNIVERSITY v. STOFER et al.

DILLARD, Chief Judge, concurring dubitante.

I concur dubitante[1] in the majority's opinion because it is a faithful analysis of

the applicability of the Recreational Property Act ("RPA"), as established by the

Supreme Court of Georgia in decisions like *Anderson v. Atlanta Committee for the*

---

[1] A concurrence dubitante is a concurrence that is given doubtfully. Unlike a concurrence in the judgment only, a special concurrence without a statement of agreement with all that is said, or a dissent (all of which render a decision physical precedent under Court of Appeals Rule 33.2), a concurrence dubitante is a full concurrence, albeit one with reservations. *See Benefield v. Tominich*, 308 Ga. App. 605, 611 n.28 (708 SE2d 563) (2011) (Blackwell, J., concurring dubitante); Jason J. Czamezki, *The Dubitante Opinion*, 39 Akron L. Rev. 1 (2006).

*Olympic Games, Inc.*[2] and *Atlanta Committee for the Olympic Games, Inc. v. Hawthorne*.[3] That said, I do not agree that possibly subjecting Mercer University to liability comports with the *codified* purpose and plain meaning of the RPA.

When interpreting a statute, we necessarily begin our analysis with "familiar and binding canons of construction."[4] In considering the meaning of a statute, our charge is to "presume that the General Assembly meant what it said and said what it meant."[5] Toward that end, we must afford the statutory text its plain and ordinary meaning,[6] consider the text contextually,[7] read the text "in its most natural and

---

[2] 273 Ga. 113 (537 SE2d 345) (2000).

[3] 278 Ga. 116 (598 SE2d 471) (2004).

[4] *Holcomb v. Long*, 329 Ga. App. 515, 517 (1) (765 SE2d 687) (2014); *accord In re L. T.*, 325 Ga. App. 590, 591 (754 SE2d 380) (2014).

[5] *Holcomb*, 329 Ga. App. at 517 (1) (punctuation omitted); *accord Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013).

[6] *Holcomb*, 329 Ga. App. at 517 (1); *accord Deal*, 294 Ga. at 172 (1) (a); *see also Tibbles v. Teachers Retirement Sys. of Ga.*, 297 Ga. 557, 558 (775 SE2d 527) (2015) ("A statute draws it meaning, of course, from its text.") (punctuation and citation omitted); *Chan v. Ellis,* 296 Ga. 838, 839 (1) (770 SE2d 851) (2015) (same); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies) . . . .").

[7] *Holcomb*, 329 Ga. App. at 517 (1); *see also Arizona v. Inter Tribal Council of Arizona, Inc*., ___ U.S. ___ (II) (B) (133 SCt 2247, 2254, 186 LE2d 239) (2013)

2

reasonable way, as an ordinary speaker of the English language would,"[8] and seek to "avoid a construction that makes some language mere surplusage."[9] And when the language of a statute is "plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly."[10]

Here, OCGA § 51-3-20 provides that "[t]he purpose of [the RPA] is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting the owners' liability toward persons entering

---

(Scalia, J.) ("Words that can have more than one meaning are given content, however, by their surroundings." (punctuation and citation omitted)); *Tibbles*, 297 Ga. at 558 ("The common and customary usages of the words are important, but so is their context.") (punctuation and citation omitted); *Chan,* 296 Ga. at 839 (1) (same); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]").

[8] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *accord Deal*, 294 Ga. at 172-73 (1) (a).

[9] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *accord In the Interest of L.T.*, 325 Ga. App. at 592.

[10] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *accord Luangkhot v. State*, 292 Ga. 423, 424 (1) (736 SE2d 397) (2013); *see also Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." (punctuation omitted)).

3

thereon for recreational purposes."[11] And in some cases, it has proved difficult to determine whether or not a property owner permitted the public on the property for recreational purposes.[12] But rather than engaging in an examination of all social and economic aspects of the activity occurring on the property[13] in order to determine whether the owner's purpose was recreational in nature, the more appropriate inquiry—as evinced by the codified purpose and relevant statutory text—is whether the owner obtained a direct pecuniary benefit from the activity.[14] To hold otherwise,

---

[11] *See Holcomb v. Long*, 329 Ga. App. 515, 518 n.15 (765 SE2d 687) (2014) ("As a part of an act passed by the General Assembly and approved by the governor, the preamble of a statute may properly be considered by our courts to the extent that it sheds light on the meaning of the substantive terms contained in the statute."); *accord Monumedia II, L.L.C. v. Dept. of Transp.*, 343 Ga. App. 49, 55 n.17 (806 SE2d 215) (2017).

[12] *See* OCGA § 51-3-21 (4) (noting that "'Recreational purpose' includes, but is not limited to, any of the following or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, aviation activities, nature study, water skiing, winter sports, and viewing or enjoying historical, archeological, scenic, or scientific sites.").

[13] *See Anderson*, 273 Ga. at 117 (2).

[14] *See* OCGA 51-3-20 ("The purpose of this article is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting the owners' liability toward persons entering thereon for recreational purposes."); OCGA § 51-3-23 ("Except as specifically recognized by or provided in Code Section 51-3-25, an owner of land who either directly or indirectly invites or permits *without charge* any person to use the property for recreational purposes does not thereby: (1) Extend any assurance that the premises are safe for any purpose; (2) Confer upon such person the legal status of an invitee or licensee to whom a duty is

4

and allow tenuous, indirect economic benefits to factor into whether a property owner is afforded the limitation of liability provided by the RPA,[15] renders the protections of the statute illusory and discourages property owners from holding or permitting the very activities the Act seeks to encourage. In my view, there should be a clear demarcation line in our RPA jurisprudence between cases where a direct economic benefit (*e.g.*, admission charge) is sought by a property owner and those where an owner merely receives an indirect benefit from holding or allowing a public event to take place on its property (*e.g.*, "the potential for additional revenue streams"). And if I were writing on a blank slate, I would rule in Mercer's favor because, as the majority notes, it neither sought nor derived a direct pecuniary benefit from holding

_____

owed; or (3) Assume responsibility for or incur liability for any injury to person or property caused by an act of omission of such persons.") (emphasis supplied); OCGA § 51-3-25 ("Nothing in this article limits in any way any liability which otherwise exists . . . (2) For injury suffered in any case when the owner of land *charges* the person or persons who enter or go on the land for the recreational use thereof . . . .") (emphasis supplied); OCGA § 51-3-21 (1) ("'Charge' means the admission price or fee asked in return for invitation or permission to enter or go upon the land.").

[15] *See supra* note 14; OCGA § 51-3-22 ("Except as specifically recognized by or provided in Code Section 51-3-25, an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes or to give any warning of a dangerous condition, use, or structure, or activity on the premises to persons entering for recreational purposes.").

a *free* concert on public property.[16] Indeed, in my view, it is impossible to reconcile the plain meaning of the RPA with the notion that a *free* concert on public property was not offered for a recreational purpose merely because private vendors sold food and drinks at a profit to attendees and Mercer sought corporate sponsorships to help defray the cost of the event.[17] To the contrary, a fair reading of the RPA strongly suggests that the *only* relevant economic consideration in these cases is whether an admission fee is charged to the public.[18] Nevertheless, as it stands, I agree with the majority that we are bound our Supreme Court's precedent in this area of the law. And while there is undoubtedly palpable tension between the Supreme Court of

---

[16] As the majority notes, Washington Park is "owned by Macon-Bibb County, but Mercer had a permit to use the park . . . [and] paid no rent to use the park for the concert . . . although Mercer did pay for security and maintain liability insurance." Majority Op. at 2. *See* OCGA § 51-3-21 (3) ("'Owner' means "the possessor of a fee interest, a tenant, a lessee, an occupant, or a person in control of the premises.").

[17] *Cf. Anderson*, 273 Ga. at 115 (1) (a) ("We hold that the RPA provides fair notice to persons of normal intelligence that a park created to celebrate the spirit of a historic and athletic and cultural event and to provide a gathering place for visitors to relax and enjoy themselves constitutes property available to the public for recreational purposes, so as to come within the Act's immunity provisions.").

[18] *See Mayor and Aldermen of Garden City v. Harris*, ___ Ga. ___, Slip Op. at 4 (Case No. S17G0692; decided January 29, 2018) ("[A] natural reading of the plain language of OCGA § 51-3-23 indicates that a landowner remains free from potential liability to any individual person who is injured on the landowner's property who has been allowed to use the property for recreational purposes free of charge.").

6

Georgia's recent decision in *Mayor and Aldermen of Garden City v. Harris*[19] and its prior opinions in *Cendeno v. Lockwood*,[20] *Anderson*,[21] and *Hawthorne*,[22] we are not at liberty to resolve it.[23]

For all these reasons, I am constrained to join the majority's opinion.

---

[19] *Id.*

[20] 250 Ga. 799, 801 (2) (301 SE2d 265) (1983), *overruled on other grounds by Atlanta Committee for the Olympic Games, Inc. v. Hawthorne*, 278 Ga. 116, 118 (1) n.3 (598 SE2d 471) (2004).

[21] 273 Ga. 113, 116 (2) (537 SE2d 345) (2000).

[22] 278 Ga. 116, 117 (1) (598 SE2d 471) (2004).

[23] *See* Ga. Const., art. VI, § VI, ¶ VI (1983) ("The decisions of the Supreme Court [of Georgia] shall bind all other courts as precedents."); *Whorton v. State*, 321 Ga. App. 335, 339 (1) (741 SE2d 653) (2013) (holding that "vertical *stare decisis* dictates that we faithfully adhere to the precedents established by the Supreme Court of Georgia"); Bryan A. Garner, *et al.*, THE LAW OF JUDICIAL PRECEDENT 155 ("When dealing with binding vertical precedent, a court has no room to decide how much weight or value to give each case.").