**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and LAND, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 29, 2023**

# In the Court of Appeals of Georgia

A21A0734. SONS OF CONFEDERATE VETERANS v. HENRY COUNTY BOARD OF COMMISSIONERS.

A21A0735. HUMPHRIES v. NEWTON COUNTY BOARD OF COMMISSIONERS.

A21A0988. SONS OF CONFEDERATE VETERANS v. NEWTON COUNTY BOARD OF COMMISSIONERS.

DILLARD, Presiding Judge.

In *Sons of Confederate Veterans v. Henry County Board of Commissioners (Sons of Confederate Veterans II)*,[1] the Supreme Court of Georgia affirmed in part and vacated in part this Court's opinion in *Sons of Confederate Veterans v. Newton County Board of Commissioners (Sons of Confederate Veterans I)*.[2] Accordingly, we vacate our former opinion and adopt the judgment of the Supreme Court as our own.

---

[1] 315 Ga. 39 (880 SE2d 168) (2022).

[2] 360 Ga. App. 798 (861 SE2d 653) (2021).

But because the Supreme Court of Georgia vacated the portion of our opinion pertaining to Tiffany Humphries in Case No. A21A0735 by concluding she has standing to bring an action against the Newton County Board of Commissioners under OCGA § 50-3-1, we must now consider whether her action for injunctive relief is barred by sovereign immunity (an issue which the Supreme Court understandably did not address).[3]

The underlying facts have been thoroughly discussed in both of the published opinions in this matter, but what is germane for purposes of this appeal is that Humphries is a resident of Newton County and filed a complaint for damages on July 13, 2020, against that county's board of commissioners. Humphries sought to recover based on the Board's violation of OCGA § 50-3-1 by holding a special meeting to

---

[3] *See Sons of Confederate Veterans II*, 315 Ga. at 65 n.22 (2) (d) (i) ("The question of whether this claim is barred by sovereign immunity is beyond the scope of our review, and we leave it to the Court of Appeals to decide the question in the first instance."); *Sons of Confederate Veterans I*, 360 Ga. App. at 806 (3) (declining to address question of whether claims were also barred by sovereign immunity after determining claims were properly dismissed for lack of standing). The Supreme Court *did* affirm the dismissal of Humphries's claim for damages. *Sons of Confederate Veterans II*, 315 Ga. at 65-66 (2) (d) (i) ("Because damages are authorized only for conduct prohibited by the statute, and the statute does not prohibit a vote to remove a monument in the future, Humphries cannot seek damages here. Accordingly, the Court of Appeals erred in affirming the dismissal of her claim for injunctive relief but was correct to dismiss her claim for damages, albeit for a different reason.").

vote on the removal of a Confederate monument located in Covington, Georgia. She

sought to recover treble and exemplary damages, and requested injunctive relief to

prevent the statue's removal. In September 2020, the trial court concluded that

Humphries lacked standing and, alternatively, that even if she had standing, her

claims were barred by sovereign immunity.

And so now, we return to and address the issue of whether Humphries's claims

are barred by sovereign immunity. She asserts they are not, but we disagree.

This Court, of course, reviews a trial court's ruling on a motion to dismiss

"based on sovereign immunity de novo because it is a matter of law,"[4] but factual

findings made by that court are "sustained if there is evidence to support them, and

---

[4] *Gwinnett Cnty. v. Ashby*, 354 Ga. App. 863, 864 (842 SE2d 70) (2020); *see Ga. Dep't of Nat'l Res. v. Ctr. for a Sustainable Coast, Inc.*, 294 Ga. 593, 596 (2) (755 SE2d 184) (2014) ("Turning to the issue of sovereign immunity, our review of this question of law is de novo."); *Fulton Cnty. Sch. Dist. v. Jenkins*, 347 Ga. App. 448, 449 (820 SE2d 75) (2018) ("This Court reviews de novo a trial court's ruling on a motion to dismiss based on sovereign immunity grounds, which is a matter of law." (punctuation omitted)); *Williams v. Wilcox State Prison*, 341 Ga. App. 290, 291 (799 SE2d 811) (2017) ("We begin by noting that this Court reviews de novo a trial court's ruling on a motion to dismiss based on sovereign immunity grounds, which is a matter of law." (punctuation omitted)), *disapproved of on other grounds by Roberts v. Unison Behav. Health*, 312 Ga. 438 (863 SE2d 99) (2021); *see also Handberry v. Stuckey Timberland, Inc.*, 345 Ga. App. 191, 191 (812 SE2d 547) (2018) ("On appeal of a trial court's ruling on a motion to dismiss, our review is de novo.").

the party seeking the waiver of immunity has the burden of proof."[5] Specifically, suits brought against the State which are barred by sovereign immunity are subject to OCGA § 9-11-12 (b) (1) dismissal for lacking subject-matter jurisdiction;[6] and like the State, counties are also protected by sovereign immunity.[7] Suffice it to say,

---

[5] *Ashby*, 354 Ga. App. at 864; *see Ga. Dep't. of Labor v. RTT Assoc., Inc.*, 299 Ga. 78, 81 (1) (786 SE2d 840) (2016) ("The burden of demonstrating a waiver of sovereign immunity rests upon the party asserting it."); *Bd. of Regents of the Univ. Sys. of Ga. v. Daniels*, 264 Ga. 328, 329 (446 SE2d 735) (1994) (explaining that the party seeking to benefit from the waiver of sovereign immunity has the burden of proving waiver); *Jenkins*, 347 Ga. App. at 449 ("The trial court's factual findings will, of course, be sustained if there is evidence supporting them, and the burden of proof is on the party seeking the waiver of immunity." (punctuation omitted)); *Williams*, 341 Ga. App. at 290 (same).

[6] *Ashby*, 354 Ga. App. at 864; *see Conway v. Jones*, 353 Ga. App. 110, 111 (1) (836 SE2d 538) (2019) ("Any suit against the State barred by sovereign immunity is subject to dismissal [under] OCGA § 9-11-12 (b) (1) for lack of subject matter jurisdiction." (punctuation omitted)); *Bd. of Trustees of Ga. Military College v. O'Donnell*, 352 Ga. App. 651, 653-54 (1) (835 SE2d 688) (2019) (same); *Dep't of Pub. Safety v. Johnson*, 343 Ga. App. 22, 23 (806 SE2d 195) (2017) (same).

[7] *Ashby*, 354 Ga. App. at 864; *see See Gilbert v. Richardson*, 264 Ga. 744, 747 (2) (452 SE2d 476) (1994) ("Absent any evidence that the legislature intended a different interpretation or to indicate that the electorate did not intend to extend sovereign immunity to counties, we hold the 1991 amendments extension of sovereign immunity to 'the state and its departments and agencies' must also apply to counties."); *Layer v. Barrow Cty.*, 297 Ga. 871, 871 (1) (778 SE2d 156) (2015) ("As a general rule, counties enjoy sovereign immunity."); *Conway*, 353 Ga. App. at 111 (1) (same); *see also* OCGA § 36-1-4 (providing that "[a] county is not liable to suit for any cause of action unless made so by statute").

sovereign immunity is a threshold determination because—like various other rules of jurisdiction and justiciability—it is "concerned with the extent to which a case properly may come before a court at all."[8] Importantly, sovereign immunity may only be waived "by an act of the General Assembly specifically providing for waiver and delineating the extent of that waiver," and implied waivers of sovereign immunity are "not favored."[9]

Of note, the Supreme Court of Georgia held in *Georgia Department of Natural Resources v. Center for a Sustainable Coast, Inc.*[10] that "sovereign immunity is a bar

---

[8] *McConnell v. Dep't of Lab.*, 302 Ga. 18, 18-19 (805 SE2d 79) (2017) (punctuation omitted); *accord Lathrop v. Deal*, 301 Ga. 408, 432 (III) (B) (801 SE2d 867) (2017); *see* GA. CONST. art. IX, § 2, ¶ IX ("The General Assembly may waive the immunity of counties, municipalities, and school districts by law."); GA. CONST. art. I, § 2, ¶ IX ("Except as specifically provided in this Paragraph, sovereign immunity extends to the state and all of its departments and agencies. The sovereign immunity of the state and its departments and agencies can only be waived by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver.").

[9] *Jenkins*, 347 Ga. App. at 450 (punctuation omitted); *see Currid v. DeKalb State Court Prob. Dep't*, 285 Ga. 184, 186 (674 SE2d 894) (2009) ("Implied waivers of governmental immunity should not be favored." (punctuation omitted)); *City of Atlanta v. Gilmere*, 252 Ga. 406, 408 (314 SE2d 204) (1984) (same).

[10] 294 Ga. 593 (755 SE2d 184) (2014).

to injunctive relief at common law."[11] But in November 2020, effective January 1, 2021, the Georgia Constitution was amended to waive sovereign immunity such that citizens may now seek declaratory relief and—after obtaining a favorable declaratory ruling—then seek injunctive relief to enforce the favorable judgment.[12] Even so, we are required to consider whether OCGA § 50-3-1 waived the county's sovereign immunity such that the trial court improperly dismissed Humphries's suit seeking injunctive relief months *before* this constitutional amendment became effective.[13] And

---

[11] *Id.* at 596 (2); *see Lathrop*, 301 Ga. at 425 (III) ("Sovereign immunity extends to suits for injunctive relief[.]").

[12] *See State v. SASS Grp., LLC*, 315 Ga. 893, 893 (885 SE2d 761) (2023) (explaining the history of the 2020 amendment to specifically waive sovereign immunity for declaratory judgments and injunctive relief for those judgments); *see also* GA. CONST. art. I, § 2, ¶ V (b) (1) (specifically waiving sovereign immunity for declaratory judgments and injunctive relief, effective January 1, 2021).

[13] *See, e.g.*, *Donaldson v. Dep't of Transp.*, 262 Ga. 49, 53 (3) (414 SE2d 638) (1992) ("It is a well settled principle of law that acts of the legislature are ordinarily given prospective effect unless the language of the act imperatively requires retroactive application."); *Anthony v. Penn*, 212 Ga. 292, 293 (92 SE2d 14) (1956) ("Unless a statute, either expressly or by necessary implication, shows that the General Assembly intended that it operate retroactively, it will be given only prospective application.").

as our Supreme Court has explained, "[u]nder Georgia law, a waiver of sovereign immunity occurs at the time that the cause of action arises."[14]

Here, Humphries argues the plain language of OCGA § 50-3-1 (b) demonstrates that sovereign immunity was waived as to appellees' alleged violation of that statute because, under OCGA § 50-3-1 (b) (2), "[n]o officer or agency shall remove or conceal from display any [statutorily protected] monument for the purpose of preventing the visible display of the same."[15] Additionally, under OCGA § 50-3-1 (b) (5), "any person, group, or legal entity shall have a right to bring a cause of action for any conduct prohibited by this Code section for damages as permitted by this Code section." That portion of the statute further provides that "[s]uch action shall be brought in the superior court of the county in which the monument was located."[16] These are the statutory provisions she claims amount to a waiver of sovereign immunity.

---

[14] *Curtis v. Bd. of Regents of Univ. Sys. of Ga.*, 262 Ga. 226, 227 (416 SE2d 510) (1992).

[15] *See* OCGA § 50-3-1 (b) (1) (B) (defining "monument" for purposes of this Code section).

[16] OCGA § 50-3-1 (b) (5).

7

Needless to say, when interpreting statutory language, we necessarily begin our analysis with "familiar and binding canons of construction."[17] And in considering the meaning of a statute, our charge as an appellate court is to "presume that the General Assembly meant what it said and said what it meant."[18] Toward that end, we must afford the statutory text its plain and ordinary meaning,[19] consider the text contextually,[20] read the text "in its most natural and reasonable way, as an ordinary

_____

[17] *Monumedia II, LLC v. Dep't of Transp.*, 343 Ga. App. 49, 51 (1) (806 SE2d 215) (2017) (punctuation omitted); *accord Holcomb v. Long*, 329 Ga. App. 515, 517 (1) (765 SE2d 687) (2014); *In the Interest of L. T.*, 325 Ga. App. 590, 591 (754 SE2d 380) (2014).

[18] *Monumedia II, LLC*, 343 Ga. App. at 51-52 (1) (punctuation omitted); *accord Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013); *Holcomb*, 329 Ga. App. at 517 (1); *Martinez v. State*, 325 Ga. App. 267, 273 (2) (750 SE2d 504) (2013).

[19] *Holcomb*, 329 Ga. App. at 517 (1); *accord* Deal, 294 Ga. at 172 (1) (a); *see Tibbles v. Teachers Retirement Sys. of Ga.*, 297 Ga. 557, 558 (1) (775 SE2d 527 (2015) ("A statute draws its meaning, of course, from its text." (punctuation & citation omitted)); *Chan v. Ellis*, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015) (same); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies) . . . ."); *Singletary v. State*, 310 Ga. App. 570, 572 (713 SE2d 698) (2011) ("In construing these statutes, we apply the fundamental rules of statutory construction that require us to construe the statutes according to their terms, [and] to give words their plain and ordinary meaning . . . ." (punctuation omitted)).

[20] *Monumedia II, LLC*, 343 Ga. App. at 52 (1); *see Arizona v. Inter Tribal Council of Ariz, Inc.*, 570 U.S. 1, 10 (II) (B) (133 SCt 2247, 186 LE2d 239) (2013)

8

speaker of the English language would,"[21] and seek to "avoid a construction that makes some language mere surplusage."[22] Simply put, when the language of a statute is "plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly."[23]

Here, Humphries maintains the above-quoted portions of OCGA § 50-3-1 waive the county's sovereign immunity from injunctive relief sought in actions brought under this Code section because any such suit must be filed in superior court, and superior courts (unlike state courts) are authorized to grant injunctive relief. But

("Words that can have more than one meaning are given content, however, by their surroundings." (punctuation omitted)); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]"); *see also Tibbles*, 297 Ga. at 558 (1) ("The common and customary usages of the words are important, but so is their context." (punctuation & citation omitted)).

[21] *Monumedia II, LLC*, 343 Ga. App. at 52 (1) (punctuation omitted); *accord Deal*, 294 Ga. at 172-73 (1) (a); *Holcomb*, 329 Ga. App. at 518 (1).

[22] *Monumedia II, LLC*, 343 Ga. App. at 52 (1) (punctuation omitted); *accord In the Interest of L.T.*, 325 Ga. App. at 592; *Holcomb*, 329 Ga. App. at 518 (1).

[23] *Monumedia II, LLC*, 343 Ga. App. at 52 (1) (punctuation omitted); *accord Holcomb*, 329 Ga. App. at 518 (1); *Luangkhot v. State*, 292 Ga. 423, 424 (1) (736 SE2d 397 (2013), *superseded by statute on other grounds as recognized by Estrada-Nava v. State*, 332 Ga. App. 133 (771 SE2d 28) (2015); *see Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." (punctuation omitted)).

the plain language of the statute does *not* waive sovereign immunity for injunctive relief.[24] Indeed, nowhere do the words enjoin, injunction, or injunctive appear within the statute—in fact, in 2019, the General Assembly *removed* language explicitly permitting such relief.[25] And that is the proverbial nail in the interpretive coffin.

Again, implied waivers of sovereign immunity are generally (and rightly) disfavored,[26] and the rules of statutory interpretation demand that we attach considerable significance to the General Assembly's removal of language permitting injunctive relief under OCGA § 50-3-1 *prior* to the filing of Humphries's action.[27] It strains credulity, then, to claim this statute encompasses an implied waiver of

[24] *See Ga. Dep't of Nat. Res.*, 294 Ga. at 603 (2) ("The plain language of [the statute] does not provide for a specific waiver of governmental immunity nor the extent of such a waiver, and therefore, no waiver can be implied or shown.").

[25] *See* Ga. Laws 2019, Act 57, § 1, *amending* former OCGA § 50-3-1 (2019) (removing "injunctive relief" from the remedies an aggrieved party may seek).

[26] *See Dep't of Transp. v. Mixon*, 312 Ga. 548, 550-51 (2) (a) (864 SE2d 67) (2021) ("Implied waivers of sovereign immunity are generally disfavored."); *City of Atlanta v. Gilmere*, 252 Ga. 406, 408 (314 SE2d 204) (1984) ("Implied waivers of governmental immunity should not be favored.").

[27] *See Jones v. Peach Trader Inc.*, 302 Ga. 504, 515 (III) (807 SE2d 840) (2017) ("Our rules of statutory interpretation demand that we attach significance to [the General Assembly's removal of language.]"); *Humthlett v. Reeves*, 211 Ga. 210, 219 (2) (85 SE2d 25) (1954) ("A legislative body should always be presumed to mean something by the passage of an act." (punctuation omitted)).

10

sovereign immunity for injunctive relief when the General Assembly deliberately removed language explicitly permitting injunctive relief under that statute[28]—a fact our Supreme Court has at least implicitly acknowledged.[29] Indeed, this legislative choice can *only* be understood as eliminating any suggested waiver of sovereign immunity for injunctive relief, and that choice must be honored by the judicial branch.[30]

---

[28] *See Ga. Mental Health Inst. v. Brady*, 263 Ga. 591, 593 (2) (a) (436 SE2d 219) (1993) ("It would be unreasonable to conclude that the General Assembly, as part of those comprehensive and exhaustive reforms, did not intend for the appeal rights of applicants for commitment [to mental health institutes] to be governed by those comprehensive provisions but by the general appeal statutes, especially considering that for so long before 1969 the General Assembly had specified that applicants had the right to appeal."); *see also Scott v. State*, 295 Ga. 39, 41 (2) (757 SE2d 106) (2014); *Holland v. Caviness*, 292 Ga. 332, 335 (737 SE2d 669) (2013).

[29] *See Sons of Confederate Veterans II*, 315 Ga. at 42 (1) (b) n.2 ("Prior to the 2019 amendment, OCGA § 50-3-1 specifically permitted injunctive relief to prevent prohibited actions to remove publicly owned or displayed monuments. Also, whereas the current version allows 'any person, group, or legal entity' to bring a cause of action, the pre-2019 version specified that '[a]ny person or entity who suffered injury or damages as a result' of a violation of the statute could bring an action 'to seek injunctive relief.'" (citation omitted)).

[30] *See Scott*, 295 Ga. at 41 (2) ("In a 2013 amendment to [the statute], the General Assembly deleted 'knowingly,' . . . throughout subsection (a). . . . [S]uch change is consistent with legislative confirmation that proof of a defendant's knowledge of each element of the trafficking statute, including weight of the drug, was required in former versions of the statute, but that the General Assembly no longer intends that it be so." (footnote omitted)); *Holland*, 292 Ga. at 335 ("Such a

11

Finally, as our Supreme Court has explained, "sovereign immunity is waived *only to the extent of the statute*, which extends no further than the remedies specifically authorized by the Act."[31] And here, the statute does *not* include injunctive relief as a remedy.[32] As a result, we affirm the trial court's dismissal of Humphries's action seeking injunctive relief on the ground that it is barred by sovereign immunity.[33]

*Judgment affirmed. Mercier and Land, JJ., concur. Dillard, P.J., and Mercier, J., concur dubitante.*

---

legislative choice reveals the intent to eliminate the jury's consideration of a defendant's worldly circumstances in an action proceeding under [the statute], and that choice must be given effect.").

[31] *City of Union Point v. Greene Cnty.*, 303 Ga. 449, 454 (1) (a) (812 SE2d 278) (2018), *disapproved of on other grounds by City of College Park v. Clayton Cnty.*, 306 Ga. 301 (830 SE2d 179) (2019).

[32] *See Sons of Confederate Veterans II*, 315 Ga. at 67 (2) (d) (ii) (noting that the relevant statute permits an award of damages, which includes "treble cost of repair, attorney's fees, and possible exemplary damages").

[33] To the extent Humphries relies on *Tittle v. Corso*, 256 Ga. App. 859 (569 SE2d 873) (2002), and OCGA § 36-33-4 to support her sovereign-immunity argument—notwithstanding that both are cited in the portion of her brief dealing with *standing*—those sources are inapplicable here. OCGA § 36-33-4 applies to municipal corporations (not counties), and the portion of *Tittle* that Humphries relies on deals with official immunity as applied to individuals, not sovereign immunity as applied to counties, *see Humphries,* 256 Ga. App. at 262 (1).

12

**A21A0734. SONS OF CONFEDERATE VETERANS v. HENRY COUNTY BOARD OF COMMISSIONERS.**

**A21A0735. HUMPHRIES v. NEWTON COUNTY BOARD OF COMMISSIONERS.**

**A21A0988. SONS OF CONFEDERATE VETERANS v. NEWTON COUNTY BOARD OF COMMISSIONERS.**

DILLARD, Presiding Judge, concurring dubitante.[1]

---

[1] A concurrence dubitante is a concurrence that is given doubtfully. Unlike a concurrence in the judgment only or a special concurrence without a statement of agreement with all that is said, a concurrence dubitante is a *full* concurrence, albeit one with reservations. *See Benefield v. Tominich*, 308 Ga. App. 605, 611 n.28 (708 SE2d 563) (2011) (Blackwell, J., concurring dubitante); *Brumbelow v. Mathenia*, 358 Ga. App. 404, 404-05 (855 SE2d 425) (2021) (Dillard, P. J., concurring dubitante). *See generally* Jason J. Czarnezki, *The Dubitante Opinion*, 39 AKRON L. REV. 1 (2006).

Old habits die hard, and so do deeply entrenched notions of justiciability. Shortly after the Supreme Court of the United States articulated and refined the modern Article III standing doctrine in *Lujan v. Defenders of Wildlife*,[2] this formulation of standing became a core component of my judicial philosophy. *Lujan* standing is appropriately animated by separation-of-powers concerns[3] and helps ensure the judiciary concerns itself with actual cases and controversies, rather than academic questions, advisory opinions, or purely political disputes.[4] And until recently, this state's constitutional standing doctrine largely mirrored that of *Lujan*

---

[2] 504 U.S. 555, 560 (112 SCt 2130, 119 LE2d 351) (1992) (Scalia, J.).

[3] *See Allen v. Wright*, 468 U.S. 737, 752 (II) (A) (104 SCt 3315, 82 LE2d 556) (1984) (noting that "the law of Art. III standing is built on a single basic idea—the idea of separation of powers"); *accord Raines v. Byrd*, 521 U.S. 811, 820 (II) (117 SCt 2312, 138 LE2d 849) (1997).

[4] *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (136 SCt 1540, 194 LE2d 635) (2016) (noting that "no principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies," and "standing serves to prevent the judicial process from being used to usurp the powers of the political branches and confines the federal courts to a properly judicial role" (punctuation omitted)); *Raines*, 521 U.S. at 820 (II) (noting that "standing is built on a single basic idea—the idea of separation of powers," and that "[i]n light of this overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere, we must put aside the natural urge to proceed directly to the merits of this important dispute and . . . carefully inquire as to whether . . . the[ ] claimed injury is personal, particularized, concrete, and otherwise judicially cognizable" (footnote omitted)).

2

and its progeny.[5] But all of that changed with the Supreme Court of Georgia's opinion in *Sons of Confederate Veterans II*,[6] and I have serious concerns about the implications of this seminal decision.

So, what is standing and why does it matter? Standing is one of several doctrines of justiciability—including ripeness, mootness, and political questions—which are crucial limitations on the judicial power (be it state or federal).[7]

[5] *See Black Voters Matter Fund, Inc. v. Kemp*, 313 Ga. 375, 382 (1) (a) (870 SE2d 430) (2022) (noting that, in order to establish standing, a party must show "(1) an injury in fact, (2) a causal connection between the injury and the alleged wrong, and (3) the likelihood that the injury will be redressed with a favorable decision," and "an 'injury in fact' is one that is both 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'" (citations & punctuation omitted)); *New Cingular Wireless PCS, LLC v. Dept. of Revenue*, 308 Ga. 729, 732 (843 SE2d 431) (2020) (same); *Granite State Outdoor Advertising, Inc. v. City of Roswell*, 283 Ga. 417, 418 (1) (658 SE2d 587) (2008) (same); *see also Feminist Women's Health Ctr. v. Burgess*, 282 Ga. 433, 434 (1) (651 SE2d 36) (2007) ("In the absence of our own authority, we frequently have looked to United States Supreme Court precedent concerning Article III standing to resolve issues of standing to bring a claim in Georgia's courts.").

[6] *See Sons of Confederate Veterans v. Henry Cnty. Bd. of Commrs*. (*Sons of Confederate Veterans II*), 315 Ga. 39 (880 SE2d 168) (2022).

[7] *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (IV) (118 SCt 1003, 140 LE2d 210) (1998) ("Standing to sue is part of the common understanding of what it takes to make a justiciable case."); *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F4th 200, 205 (II) (3d Cir. 2021) (noting that "Courts enforce the case-or-controversy requirement through the several justiciability doctrines," which "include standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions," and "[s]tanding is perhaps the most important of

As one prominent legal scholar has explained, "jusiticiability doctrines determine which matters . . . courts can hear and decide and which must be dismissed."[8] Importantly, these justiciability doctrines "are closely tied to separation of powers," and they "limit the power of the judiciary . . . and define the judicial role . . . ."[9] And as to standing, it is the "determination of whether a specific person is the proper party to bring a particular matter to a . . . court for adjudication."[10] Put another way, the question of standing is "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."[11] Importantly, much like the Supreme Court of the United States, the Supreme Court of Georgia has interpreted the Judicial

these doctrines" (punctuation omitted)).

[8] Erwin Chemerinsky, FEDERAL JURISDICTION § 2.1, p. 42 (2nd ed. 1994).

[9] *Id.* at § 2.1, p. 43; *see supra* note 4 & accompanying text.

[10] Chemerinsky, *supra* note 8, at § 2.3.1, p. 53; *see also* Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing Doctrine?*, 102 MICH. L. REV. 689, 694 (I) (B) (2004) (noting that "[t]he question of which parties may properly come to court to vindicate these different kinds of legal rights is central to the issue of standing").

[11] *Warth v. Seldin*, 422 U.S. 490, 498 (95 SCt 2197, 45 LE2d 343) (1975).

Power Paragraph of the Georgia Constitution to include a standing requirement of litigants.[12] And rightly so.

This brings us to the Supreme Court of Georgia's opinion in *Sons of Confederate Veterans II*,[13] which vacated in part our decision in *Sons of Confederate Veterans I*.[14] It is a well-written, thoughtful, and scholarly opinion. That said, I am not so sure our Supreme Court's considerable expansion of this state's standing doctrine

---

[12] *See* 315 Ga. at 44-45 (2) 9a) (noting that "[s]tanding is a jurisdictional prerequisite to a plaintiff's right to sue," and that "[a] plaintiff with standing is necessary to invoke a court's judicial power to resolve a dispute, and the power of Georgia courts—as with any power possessed by a branch of state government—is conferred by our state Constitution"); *Black Voters Matter Fund*, 313 Ga. at 380 (1) (same); *Ames v. JP Morgan Chase Bank, N.A.*, 298 Ga. 732, 740 (3) (d) n.6 (783 SE2d 614) (2016) (same).

[13] 315 Ga. 39 (880 SE2d 168) (2022).

[14] *Sons of Confederate Veterans v. Newton Cnty. Board of Commrs.* (*Sons of Confederate Veterans I*), 360 Ga. App. 798 (861 SE2d 653) (2021).

is necessarily required by the text, structure, and history of the Georgia Constitution;[15] but I am also not sure that it is wrong.[16]

This case is about the fundamental and limited—albeit unquestionably important—nature of the judicial power.[17] As most of us know from our middle-

---

[15] I agree with our Supreme Court that, even though this case is "about a highly controversial subject," the question of "whether local communities must continue displaying (and maintaining at public expense) monuments that celebrate the Confederacy and its long-dead supporters, despite those communities finding such celebration repugnant," is not "at issue in this appeal." *Sons of Confederate Veterans II*, 315 Ga. at 39. What is at issue is the fundamental nature and scope of standing doctrine under the Georgia Constitution, and how that doctrine will be applied to future cases—regardless of subject matter.

[16] In its opinion, the Supreme Court of Georgia noted the possibility that "[t]he Georgia Constitution might impose a higher requirement when a plaintiff challenges the constitutionality of a statute" because it has "long held that in such cases, the plaintiff must show an actual, individualized injury." *Sons of Confederate Veterans II*, 315 Ga. at 39. Even so, it declined to address "whether this additional requirement arises from the Georgia Constitution, such that the General Assembly cannot abrogate it by statute, because the plaintiffs in this case do not challenge a statute as unconstitutional." *Id.* And like our Supreme Court, I see no need to address this issue.

[17] *See* THE FEDERALIST No. 48 (James Madison) (noting that it "is not unfrequently a question of real nicety in legislative bodies whether the operation of a particular measure will, or will not, extend beyond the legislative sphere," whereas "the executive power [is] restrained within a narrower compass and . . . more simple in its nature," and "the judiciary [is] described by landmarks still less uncertain"); THE FEDERALIST No. 81 (Alexander Hamilton) (noting that "the supposed danger of judiciary encroachments . . . can never be so extensive as to amount to an inconvenience, or in any sensible degree to affect the order of the political system. This may be inferred with certainty, from the general nature of the judicial power,

6

school civics class, the judiciary does not provide advisory opinions[18] and it is not

designed to answer overarching policy questions.[19] Indeed, as the Supreme Court of

_____

from the objects to which it relates, from the manner in which it is exercised, from its comparative weakness, and from its total incapacity to support its usurpations by force").

[18] *See McDowell v. Judges Ex Officio*, 235 Ga. 364, 365 (219 SE2d 713) (1975) (noting that "[n]ot even in a declaratory judgment action is the court permitted to render an advisory opinion"); *Bd. of Commrs. of Walton Cnty. v. Dept. of Public Health*, 229 Ga. 173, 175-76 (2) (190 SE2d 39) (1972) (noting that "[i]n raising those questions on appeal, the appellant seeks to secure the opinion of this court on hypothetical and academic legal questions not involved in this case and not shown yet to have arisen but which appellant fears may arise at some future time, and, in raising these questions, appellant seeks merely an advisory opinion of this court to guide appellant in its future course of conduct. This court is not authorized to render such an opinion"); *Hinson v. First Nat. Bank in Waycross*, 221 Ga. 408, 410 (1) (144 SE2d 765) (1965) (noting that "[t]his court has many times held that it will not render advisory opinions or pass upon the constitutionality of a statute unless it deprives a party of substantial rights"); *Hand v. Berry*, 170 Ga. 743, 746 (154 SE 239) (1930) (noting that "[h]owever much this court might be disposed to decide the abstract question presented . . . we are without jurisdiction to do so in the present case").

[19] *See Kerry v. Din*, 576 U.S. 86, 97 (135 SCt 2128, 192 LE2d 183) (2015) (Scalia, J.) (noting that "[t]his Court has consistently recognized that these various distinctions are policy questions entrusted exclusively to the political branches of our Government, and we have no judicial authority to substitute our political judgment for that of the Congress" (punctuation omitted)); Robert H. Bork, *The Tempting of America* 191 (1990) (noting that "[l]egislative decisions involve a mix of, or a tradeoff between, principle and expediency. The Constitution holds that in decisions left to the democratic process, the tradeoff we are entitled to is the one the legislature provides. Courts have no apparent mandate to impose a different tradeoff merely because they would arrive at a mix that weighed principles more heavily. There is no objectively correct balance between principles and expediency, so it is meaningless to say that legislatures inherently fall short of the right balance"); Walter McElreath,

7

Georgia has rightly recognized, "[c]ourts are not vehicles for engaging in merely academic debates or deciding purely theoretical questions."[20] But I fear we are treading into similar territory with *Sons of Confederate Veterans II*.

Even so, if the Supreme Court of Georgia is correct that the relevant text, structure, and history of the Georgia Constitution are such that a community stakeholder has *constitutional* standing to file a lawsuit challenging a governmental decision even when he or she has not suffered an *individualized* injury, then that is the end of the matter. The only remedy for a deeply flawed but interpretively required standing doctrine is to amend our Constitution, not to pretend it does not exist. But again, I have serious doubts as to whether our Supreme Court is correct that such an interpretation is actually required.

I will start with the relevant constitutional text. Article VI of the Georgia Constitution provides "[t]he judicial power of the state shall be vested *exclusively* in the following classes of courts: magistrate courts, probate courts, juvenile courts,

---

*McElreath on the Constitution of Georgia* § 1243 (1912) (noting that courts are not charged with "judging of the wisdom, policy or expediency of laws these matters being purely of legislative jurisdiction and cognisance, and not restraining the legislative discretion by construction").

[20] *Sons of Confederate Veterans II*, 315 Ga. at 39.

8

state courts, superior courts, state-wide business court, Court of Appeals, and Supreme Court . . . ."[21] And as the Supreme Court of Georgia aptly notes, this text does differ from the language of Article III of the United States Constitution, in that it does not explicitly refer to "cases" and "controversies."[22] But respectfully, this seems to me to be a textual distinction without much of a difference. After all, "cases and controversies" are what courts are designed to handle. This concept is not unique to Georgia; it goes to the very heart of the *American* judicial power.[23] And to its credit, our Supreme Court makes exactly this point in *Sons of Confederate Veterans II*:

> From the earliest days of this Court we have understood the power of courts—the judicial power—to be limited to *cases involving actual controversies*, which requires a showing of some injury. Our case law has been essentially consistent in reflecting this understanding, all of which informs the meaning of the Judicial Power Paragraph when it was

---

[21] Ga. Const. art. VI, § 1, ¶ I (1983).

[22] *Sons of Confederate Veterans II*, 315 Ga. at 45 (2) (a).

[23] *See* Woolhandler & Nelson, *supra* note 10, at 694 (I) (B) (noting that "[t]he question of which parties may properly come to court to vindicate these different kinds of legal rights is central to the issue of standing," and that "[i]n trying to address that question, American courts have traditionally drawn partly upon general principles of jurisprudence and partly upon distinctively American ideas about popular sovereignty, limited government, and the separation of powers").

readopted in the 1983 Constitution. Because the Judicial Power Paragraph vests the "judicial power" in state courts, and the nature of judicial power has long been understood as *limited to resolving those controversies* in which there is a cognizable injury, the requirement that plaintiffs have a cognizable injury in order to invoke the power of the courts is a standing requirement arising from the Georgia Constitution's Judicial Power Paragraph.[24]

On this much, the Supreme Court of Georgia and I are in complete agreement. Our Supreme Court is also right that—in order to invoke a Georgia court's "judicial power"—a plaintiff must "have a cognizable injury that can be redressed by a judicial decision."[25] I also agree courts should only "say what the law is" as is "needed to resolve an actual controversy."[26] But the devil is in the details: What constitutes an injury for purposes of standing under the Georgia Constitution? The *Sons of Confederate Veterans II* Court answered this question directly, concluding that—under the Georgia Constitution—an injury "need not always be individualized; sometimes it can be a generalized grievance shared by community members,

---

[24] *Sons of Confederate Veterans II*, 315 Ga. at 62 (2) (c) (iii) (emphasis supplied).

[25] *Id*.

[26] *Id.* at 39.

10

especially other residents, taxpayers, voters, or citizens."[27] And to its credit, the Supreme Court of Georgia marshals a considerable amount of precedent in *Sons of Confederate Veterans II* to support this proposition. But our Supreme Court's opinion leaves certain important questions unanswered; so—for now—consider me *dubitante*. Here is my main concern.

In *Sons of Confederate Veterans II*, the Supreme Court of Georgia asserts that "[t]he Judicial Power Paragraph has been carried forward without material change from its initial appearance in the 1798 Constitution to the current Constitution of 1983."[28] And while it is certainly true the current version of the Judicial Power Paragraph looks a good bit like the 1798 version of that paragraph, the 1983 version added an important adverb to the text which further defined the nature and scope of the judicial power in this state—"*exclusively*." This is unquestionably a material change to the plain (and possibly) original meaning of the Judicial Power Paragraph of the Georgia Constitution, and I think it is difficult to suggest otherwise. What is up for serious debate is the *extent* of this substantive change to the meaning of that important constitutional paragraph.

---

[27] *Id.*

[28] *Id.* at 46 (2) (a).

11

Let us begin with the ordinary signification of "exclusively." The Oxford English Dictionary—the authoritative source on the meaning of the English language—defines "exclusively" as, *inter alia*, "[t]o the exclusion of, without the participation of, the persons or things designated . . . [s]o as to exclude all except some particular object, subject, etc.; solely."[29] So, what does the insertion of "exclusively" into the text of the Judicial Power Paragraph mean in how we are to understand the nature of the judicial power in Georgia? Simple logic dictates it means at least three things (and possibly more): (1) to the extent the executive or legislative branches of Georgia's government previously exercised any type of judicial power or acted in a way that directly or indirectly diminished the judicial power, they are no longer authorized to do so; (2) the fundamental nature of the judicial power (as exercised by the courts outlined in the Georgia Constitution's Judicial Power Paragraph) has been dramatically strengthened because of this new exclusivity—as that power now resides *solely* with the state judiciary; and (3) the exclusivity of this judicial power unquestionably has separation-of-powers implications.

---

[29] *Exclusively*, THE OXFORD ENGLISH DICTIONARY (online ed. March 2023), *available at* https://www.oed.com/view/Entry/65834.

What then is the net result of this strengthened, exclusive judicial power? I am not entirely sure. What I do know is that I cannot quibble with our Supreme Court's conclusion in *Sons of Confederate Veterans II* that the Judicial Power Paragraph "does not purport to define what is meant by '[t]he judicial power,'" and "there is no *explicit* limitation on its scope (unlike its federal counterpart)."[30] But the question remains: Is there something about the fundamental nature of the judicial power that

---

[30] *Sons of Confederate Veterans II*, 315 Ga. at 47 (2) (a).

*inherently* contains such a limitation?[31] I think there just might be for the reasons I have already articulated.

---

[31] *See Spokeo*, 578 U.S. at 343 (Thomas, J., concurring) ("The judicial power of common-law courts was historically limited depending on the nature of the plaintiff's suit. Common-law courts more readily entertained suits from private plaintiffs who alleged a violation of their own rights, in contrast to private plaintiffs who asserted claims vindicating public rights. Those limitations persist in modern standing doctrine."); *see also* Woolhandler & Nelson, *supra* note 10, at 692 ("In favoring a private-injury requirement for private litigation, [early American court] decisions were influenced by American ideas about the proper role of the judiciary, its relationship to the political branches of the state and federal governments, and the legitimate allocations of public and private power."); James Leonard & Joanne C. Brant, *The Half-Open Door: Article III, the Injury-in-Fact Rule, and the Framers' Plan for Federal Courts of Limited Jurisdiction*, 54 RUTGERS L. REV. 1, 5-6 (2001) (noting that "[o]ur first impression was that the Framers had at best vague thoughts about the proper reach of federal jurisdiction . . . and that the courts and Congress should have latitude in expanding standing to promote the enforcement of federal laws," but that "[t]his permissive view of standing . . . does not comport either with the legal environment of the late Eighteenth Century *or the structure of the Constitution*," that "[a] review of the historical materials surrounding the adoption of the Constitution such as the records of the 1787 Convention and the ratification debates has convinced us that the Framers most likely viewed the courts as places where individual litigants came to have actual and personal grievances resolved," and that "*the injury-in-fact rule is necessary to keep the balance that the Framers intended among the branches of government*" (emphasis supplied)); *cf. Sons of Confederate Veterans II*, 315 Ga. at 49-50 ("Despite the absence of an explicit limitation on judicial power to 'cases' and 'controversies' in the Georgia Constitution's Judicial Power Paragraph, . . . we have long understood the nature of judicial power itself to contain a similar limitation. The judicial power is that which declares what law is, and applies it to past transactions and existing cases; . . . it expounds and judicially administers the law; . . . it interprets and enforces the law in a case in litigation." (punctuation omitted)).

In my view, the narrow standing doctrine pronounced by the Supreme Court of the United States in *Lujan* and its progeny is far more consistent with the fundamental nature of the judicial power than the far more expansive standing doctrine embraced by our Supreme Court in *Sons of Confederate Veterans II*, and serves to insulate courts from being unnecessarily transformed into forums for settling hotly contested political disputes that are more appropriately resolved in the legislative or electoral arenas. And in the absence of irrefutable evidence that the pre-1983 caselaw relied upon by the Supreme Court in *Sons of Confederate Veterans II* is carried over to the 1983 version of the Judicial Power Paragraph (notwithstanding the material change noted above),[32] I would stay the course with *Lujan* and its

---

[32] *Cf. Sons of Confederate Veterans II*, 315 Ga. at 47 (2) (a) (noting that because "the meaning of a previous provision that has been readopted in a new constitution is generally the most important legal context for the meaning of that new provision, *and because we accord each of those previous provisions their own original public meanings*, we generally presume that a constitutional provision retained from a previous constitution *without material change* has retained the original public meaning that provision had at the time *it first entered a Georgia Constitution, absent some indication to the contrary*" (emphasis supplied)).

15

progeny.[33] But because I am duty bound to follow our Supreme Court's precedents,[34] I concur *dubitante*.

I am authorized to state Judge Mercier joins this concurrence.

---

[33] *Lujan*, 504 U.S. at 560 (II) (noting that "some of [constitutional standing doctrine's] elements express merely prudential considerations that are part of judicial self-government"); *see, e.g.*, *United States v. Windsor*, 570 U.S. 744 (133 SCt 2675, 186 LE2d 808) (2013); *Hollingsworth v. Perry*, 570 U.S. 693 (133 SCt 2652, 186 LE2d 768) (2013); *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167 (120 SCt 693, 145 LE2d 610) (2000); *see also Allen*, 468 U.S. at 751 (II) (A) (noting that the constitutional standing doctrine has prudential and constitutional components).

[34] *See* GA. CONST., art. VI, § VI, ¶ VI (1983) ("The decisions of the Supreme Court [of Georgia] shall bind all other courts as precedents."); *Whorton v. State*, 321 Ga. App. 335, 339 (1) (741 SE2d 653) (2013) (holding that "vertical *stare decisis* dictates that we faithfully adhere to the precedents established by the Supreme Court of Georgia"); *see also* Bryan A. Garner *et al.*, THE LAW OF JUDICIAL PRECEDENT 155 ("When dealing with binding vertical precedent, a court has no room to decide how much weight or value to give each case."); Kurt T. Lash, *Originalism, Popular Sovereignty, and Reverse Stare Decisis*, 93 VA. L. REV. 1437, 1454 (II) (2007) (noting that "[v]ertical stare decisis refers to the binding effect of precedent on lower courts," and that "[s]erious rule of law costs would follow if lower courts were free to ignore precedent established by a higher court of appeal"); *cf.* Kay Armstrong Carter, THE SELECTED WRITINGS OF LOUIS E. ARMSTRONG 73 (1983) (noting that "[o]ne of the harsh facts of life is this: You were born to be responsible, to make choices between this and that, and there's no way that you can avoid it, however much you might want to").